**BELK–AVERY, INC., a corporation, Plaintiff,**

v.

**HENRY I. SIEGEL CO., INC., a corporation, Defendant.**

Civ. A. No. 77–336–N.

United States District Court, M. D. Alabama, N. D.

Oct. 10, 1978.

Albert P. Brewer and David B. Byrne, Jr., Robison, Belser, Brewer & Mancuso, Montgomery, Ala., for plaintiff.

Euel A. Screws, Jr., and Robert D. Segall, Hobbs, Copeland, Franco & Screws, Montgomery, Ala., for defendant.

## MEMORANDUM

JOHNSON, Chief Judge.

This action charges that defendant enforced a price-fixing scheme in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1. The plaintiff, Belk-Avery, Inc., is an Alabama corporation engaged in the retail clothing business. At the time it instituted this action, plaintiff operated eight stores in three states.[1] The defendant, Henry I. Siegel Co., is a New York corporation manufacturing men's and women's clothing under the brand name "H.I.S." This case

---

1. During the time of its dealings with H.I.S., Belk-Avery operated two department stores, two women's stores, and four university shops. The university shop in Jackson, Mississippi, was closed in January, 1976; the shop in Alexandria, Louisiana, in May, 1976; and the shop in Auburn, Alabama, in May, 1977. Belk-Avery converted its department store in Fort Walton Beach to a discount center called the "Brown Bag" and opened a second Brown Bag in Gadsden, Alabama, in November, 1976.

concerns only men's clothing in which line H.I.S. manufactures suits, sport coats, slacks, jeans, and shirts. H.I.S. is one of roughly a dozen major firms that compete for the medium price range in men's apparel.

## THE FACTS

Plaintiff would have the Court perform its fact-finding mission with blinders on. It would focus the Court's attention on the two-month period from November 3, 1976, when the opening of the Brown Bag in Gadsden was announced, to January 3, 1977, when defendant refused to accept plaintiff's orders, with checks attached, for $20,000 of merchandise. The relevant time period of this lawsuit cannot be so narrowed, nor the scrutiny of the Court so straight-fixedly directed. A glance to the past reveals that the key to this dispute is its history, which begins in the spring of 1974, when H.I.S. shipped its first order to Belk-Avery.[2] From that date, the recurring theme is Belk-Avery's poor credit.

In 1974, payment was overdue on virtually every invoice, occasionally by as much as 77 days. In June, 1974, H.I.S. cancelled pending orders because of past due accounts. In December, additional orders were cancelled because of past due accounts. At the end of the year, Belk-Avery owed H.I.S. over $8,000. Approximately $15,000 of orders for the spring were being held because of the account's delinquent status.

The year 1975 saw no improvement in Belk-Avery's performance. In March, H.I.S. repeated its request to Belk-Avery for up-to-date financial information. In April, Belk-Avery provided such information, and H.I.S. opened a $10,000 line of credit. By that time, however, more orders had been cancelled because of past due payments. Again on April 22, H.I.S. cancelled orders for $28,000 because Belk-Avery owed $10,700, of which $4,100 was overdue. Mid-year found H.I.S. holding $22,000 of orders pending payment of past invoices. In August, Belk-Avery submitted additional financial information. Its line of credit was increased, and, momentarily, there appeared some hope that plaintiff would correct its laggard practices. The hope was short-lived. On September 25, the Associate Credit Manager for H.I.S. wrote J. R. Avery, president of Belk-Avery, informing him that H.I.S. records showed $8,000 owing with merchandise totaling $7,300 en route. H.I.S. thus found it necessary to place $53,000 of orders on hold. Over the next two months, because of Belk-Avery's continuing failure to pay its bills on time, H.I.S. cancelled orders for over $40,000 and returned them to its salesmen, Randy Stelk and Joe Levy. In November, 1975, with Belk-Avery owing $13,743.65, H.I.S. turned the account over to a collection agency. This action resulted in a phone call from J. R. Avery, who denied having received any messages about the account and threatened to influence the Belk chain to drop H.I.S. The call ended with a promise that the account would be paid by December 1. Seven checks, comprising partial payment of the outstanding debt, were received on November 29. All seven checks, however, were backdated, one by four and one-half months. A curt letter from H.I.S. followed with the message that when a "customer becomes evasive and uses obstructionist tactics to deliberately delay his satisfying his obligation," the company must use stern methods.[3] The year ended with another letter requesting payment of past due invoices, and with Belk-Avery's credit cut off.

Thus, almost one year before the opening of the Brown Bag in Gadsden, H.I.S. had terminated its dealings with Belk-Avery, and with ample cause. There is no ambiguity in the records. In late 1975, H.I.S. terminated its dealings with Belk-Avery because of plaintiff's poor credit record; H.I.S. acted unilaterally and in good faith.

The year 1976 began with additional collection letters. With H.I.S. refusing to sell, Belk-Avery sought one more chance. In February, a unique trial arrangement was worked out. Belk-Avery would deposit

---

2. Then known as "Belk-Avery-Pittman."

3. Exhibit 5 (defendant's pretrial brief).

$15,000 with H.I.S., and H.I.S. would then ship orders up to that amount. As Belk-Avery understood the arrangement, if it timely paid its orders for the upcoming season, the deposit would be applied against the fall season's orders. As understood by H.I.S., the deposit would be held until Belk-Avery took three steps designed to establish its credit worthiness: (1) the payment of invoices in a timely fashion, (2) the provision of a current financial profile, and (3) the maintenance of clean trade clearances. The Court finds that the latter understanding accurately reflects the agreement reached. Even if Belk-Avery's representation of the agreement were accurate, however, the evidence from 1976 is that Belk-Avery did not carry out even that limited commitment. Payment of invoices remained tardy.

H.I.S. received the $15,000 deposit on February 26, 1976. By June, Belk-Avery had fallen behind in its payments, and a call was placed to Jay Doblin of Belk-Avery to "get them to pay invoices upon receipt." [4] By mid-October, outstanding invoices, totaled almost $15,000. Additional orders for $25,000 had been solicited by Randy Stelk, the H.I.S. salesman for Tallahassee. The credit department advised him that further orders would not be approved. Stelk appealed to the district sales manager, John Eurton, who, in turn, asked the credit department to reconsider. In light of the overdue payments, it refused to open a line of credit, but suggested that Belk-Avery might secure a letter of credit. Belk-Avery refused; Stelk withheld the $25,000 of orders. Thus in October, 1976, before the opening of the Brown Bag in Gadsden, the relationship between H.I.S. and Belk-Avery had for the second time in twelve months come to the brink of termination.

It is against this background that the events of November, 1976, must be viewed. On November 3, an ad appeared in *The Gadsden Times* announcing the opening of the "Brown Bag," a cash and carry discount store. On November 4, Joe Levy, the H.I.S. salesman for Alabama, heard about the opening from another salesman. Levy drove to Gadsden, visited the Brown Bag, inspected the H.I.S. merchandise for sale there, and removed a price tag from an H.I.S. suit. Learning that the Brown Bag was a Belk-Avery store, Levy called Belk-Avery's former buyer, Jay Doblin, to find out how H.I.S. merchandise had reached that store without his knowledge. He told Doblin that his other customers in Gadsden were upset about H.I.S. merchandise being sold in the Brown Bag and had complained to him. In a subsequent call to Robert Luehrs, the national sales manager for H.I.S., Levy again mentioned customer complaints about the Brown Bag. The evidence strongly suggests that at the time Levy made these calls he had received no complaints from H.I.S. accounts in the Gadsden area.[5] In his anger over having H.I.S. merchandise transferred to a new store without his being informed, Levy apparently elaborated on the truth in order to impress his superiors with the importance of taking some retaliatory action. Both Luehrs and Sal Morello, credit manager for H.I.S., told Levy there was nothing they could do. Morello did suggest that Levy call John Eurton, the district sales manager, "to resolve the matter." That was the last Morello heard from Levy. But Eurton subsequently called following his conversation with Levy to reiterate that the sales department "wanted to sell the [Belk-Avery] account."

Then, on November 15, Morello received a call from J. R. Avery in which "he came on like gang busters." Informed that a line of credit could not be established, he demanded interest on the $15,000 deposit and "went into a tirade, stating that his company is much bigger than ours, better rated, etc., and he requested copy of our financial statement." Morello related the conversation to Bert Rosenberg, chief administrative officer of H.I.S., who requested a memorandum on the account. In that memorandum,

---

4. Exhibit 6 (defendant's pretrial brief).

5. About November 8, Levy contacted Allen Berman, a friend and also the owner of Budd's,

Levy's largest account in Gadsden and in Alabama. They spoke about the Brown Bag and its discount pricing of Levi's and other brands.

submitted the same day, Morello explained Belk-Avery's record of poor credit and recommended that orders be accepted only on a cash-in-advance basis. The recommendation is indicative of how unimportant the Brown Bag incident was to H.I.S. management. Morello's overriding concern was Belk-Avery's credit worthiness; his conclusion was not that the account should be closed, but that it should be continued.

The following day Rosenberg responded, directing that the account be closed because H.I.S. is "not set up to constantly do business on a 'cash before delivery' basis—it has always been our policy to consider 'cash before delivery' only at the beginning of our relationship with a customer." It is clear that Rosenberg acted on the basis of Belk-Avery's credit record. He had never spoken to Joe Levy nor read Levy's note to Luehrs. What he knew about the Brown Bag came from Morello's memorandum. But the memorandum gives the clear impression that Levy's concern was resolved, and that the salesmen in the area desired to continue selling to Belk-Avery. The Court therefore concludes that when Rosenberg ordered a cessation of dealing with Belk-Avery, the opening of the Brown Bag and the actions of Joe Levy had no causal connection with that decision.[6]

### THE LAW

#### A. The "Contract Combination, or Conspiracy" Requirement

■ Under the Sherman Act, resale price maintenance is illegal *per se.* *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Greene v. General Foods Corp.,* 517 F.2d 635 (5th Cir. 1975). Before liability can attach, however, Section 1 of the Act requires proof of a combination or agreement. In the absence of an agreement, express or implied, the seller may exercise its "long recognized right" to refuse to deal with a customer that does not adhere to the terms of sale previously announced by the seller. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Subsequent cases have narrowed the *Colgate* doctrine. *FTC v. Beech-Nut Packing Co.,* 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); *United States v. Bausch & Lomb Optical Co.,* 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); *United States v. Parke, Davis & Co., supra; Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). The doctrine does not immunize "methods which go beyond the simple refusal to sell to customers who will not resell at stated prices." The manufacturer may not take "affirmative action"; the customer's acquiescence must be a product of free choice, "prompted alone by the desirability of the product." *Parke, Davis,* 362 U.S. at 42, 47, 80 S.Ct. at 511, 513.

Defendant H.I.S. successfully walks the tightrope of the *Colgate* doctrine. The evidence reflects no resort to the kind of methods condemned in other cases. H.I.S. did not use codes or certificates to police the pricing of its customers as in *Beech-Nut* and *Bausch & Lomb.* It did not coerce or cooperate with wholesalers to enforce through them retailer adherence to pegged prices as in *Parke, Davis*; nor, as in that case, did it use one retailer's apparent willingness to cooperate as a lever to secure the participation of other retailers. Unlike the defendant in *Albrecht,* H.I.S. did not introduce a new competitor to undermine the Brown Bag. Plaintiff rests its contention that there was a "combination" on the actions of Joe Levy, the H.I.S. salesman for northern and middle Alabama. The evidence is that, upon learning of the opening of the Brown Bag, he called Jay Doblin, the

---

**6.** In late December, 1976, Jay Doblin inquired about shipment and threatened to go to the S.E.C. [sic]. At that time, H.I.S. submitted the Belk-Avery account for trade clearance. Five of seven manufacturers shipping to Belk-Avery reported credit problems. On January 3, 1977, J. R. Avery none too subtly moved to pressure H.I.S. by personally mailing orders for $20,000, with checks attached, asserting that "[w]e are current and have been current with H.I.S. all along." The letter noted that a copy was being sent to plaintiff's attorneys. Morello repeated H.I.S.'s position that it was not equipped to handle the account on a prepayment basis. As he had in October and November, Morello again requested a satisfactory financial statement.

former buyer for Belk-Avery, to complain about the character and possibly the pricing policy of the store. Levy then communicated his displeasure to two H.I.S. executives and his district sales manager. Finally he discussed the Brown Bag with another H.I.S. customer in Gadsden.

These facts superficially resemble those in *Girardi v. Gates Rubber Co. Sales Division*, 325 F.2d 196 (9th Cir. 1963), upon which plaintiff so heavily relies. There are important differences, however, that call for a different conclusion. In *Girardi*, plaintiff appealed from an adverse judgment entered after the presentation of his evidence. Considering the case in that posture, the Court of Appeals was compelled to view the evidence in the light most favorable to the plaintiff. This Court, of course, does not operate under that constraint in this case. While the facts in *Girardi* and the instant case are similar, the Court need not draw every possible inference favorable to the plaintiff.

The Court finds that Levy did not act at the behest of any of Belk-Avery's competitors. He acted on impulse, spurred by his surprise, then anger, at discovering in his territory a new store handling H.I.S. merchandise. His bluster about complaints from other H.I.S. customers cannot be equated with a customer's actual exercise of its influence as in *Girardi*. Moreover, it is undisputed that Levy's only contact with Belk-Avery was a phone call to Jay Doblin, manager of the Selma store. Yet Levy had already ascertained that the H.I.S. clothing in the Brown Bag had come from Belk-Avery's Tallahassee store. He knew as well that Doblin was no longer Belk-Avery's buyer. Doblin had been replaced by Dan Milton in Tallahassee. Levy's call to Doblin in Selma, then, was less a calculated attempt to threaten Belk-Avery than it was an effort, through an old business acquaintance, to confirm his suspicions about the Brown Bag.

Most important of all, Levy's reaction to the Brown Bag did not reflect the attitude, the policy, or the directives of H.I.S. management. In no previous case has a combination or conspiracy been inferred from the unauthorized actions of a lone salesman. In *Girardi*, plaintiff's competitors communicated with the defendant's district manager as well as its salesman. The evidence suggested that the district manager orchestrated defendant's every move with respect to plaintiff Girardi. Similarly, in *Parke, Davis*, defendant's Baltimore office manager acted to enforce compliance with suggested minimum retail prices on instructions from the head office. In *Beech-Nut, Bausch & Lomb*, and *Albrecht*, the Supreme Court inferred a combination only from official policy executed by the highest levels of management. The facts in this case are quite different. Levy acted on his own initiative in calling Doblin. When Levy subsequently spoke to Robert Luehrs and Sal Morello in the H.I.S. New York office, they both expressed little or no concern and told him there was nothing they could do. The unimportance attached by Morello to Levy's report is confirmed by the offhand reference to it in Morello's memorandum to Rosenberg of November 15, 1976. Levy also reached his immediate supervisor, district sales manager John Eurton. Eurton, too, was clearly unimpressed by Levy's complaint concerning the Brown Bag. The evidence shows that, despite Levy, he continued to lobby the New York office in favor of sales to Belk-Avery. Considered in context, Levy's actions should not be construed to implicate H.I.S. in a combination or conspiracy.

█ The same conclusion follows regarding Levy's conversations with Allen Berman, president of Budd's. If Berman first contacted Levy about the Brown Bag, that is not enough to imply the existence of a combination. It is "the normal working of the marketplace" for customers to complain about their competitors' practices. *Carbon Steel Products Corp. v. Alan Wood Steel Co.*, 289 F.Supp. 584, 588 (S.D.N.Y.1968); *see Klein v. American Luggage Works, Inc.*, 323 F.2d 787 (3d Cir. 1963). In *Klein*, the court held there could be no conspiracy where defendant's agent, who received complaints about price-cutting, did not report them. It follows, and this Court holds, that even where the agent reports such complaints, there is no combination if man-

agement attaches no significance to the complaints and disregards them. Alternatively, if Levy first contacted Berman, it would entail a misapplication of the law, based on the facts of this case, to infer a combination. The Fifth Circuit in *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 38, *cert. denied*, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972), suggested that a combination could be inferred from an act taken for the purpose of demonstrating to defendant's customers that it intends to enforce adherence to a price schedule. The background of Levy and Berman's relationship, however, rules out the possibility that Levy called to warn Berman about discounting H.I.S. clothing. As a friend with whom Levy was in frequent business contact, Berman was the last person who would have been called as part of such an effort. Yet there is no probative evidence that Levy talked to any other H.I.S. customers in the Gadsden area.

■ The Supreme Court in *Albrecht* suggested that the plaintiff might have successfully claimed that the defendant combined with other customers "because the firmly enforced price policy applied to all [customers], most of whom acquiesced in it." 390 U.S. at 150 n.6, 88 S.Ct. at 872. That theory of combination cannot be applied here because the evidence shows that H.I.S. never formulated a price maintenance scheme. In 1976, H.I.S. salesmen did preticket merchandise. But throughout the company's history, H.I.S. customers have discounted prices and advertised those discounts without interference from the company. It has even subsidized the advertising of discounted H.I.S. merchandise. The evidence from H.I.S. customers in Gadsden is that they, too, have discounted prices and that H.I.S. has never attempted to stop the practice. Even plaintiff's employees testified that Belk-Avery stores had discounted H.I.S. merchandise and advertised the discounts.[7] Thus, even if Levy's contact with Doblin or Berman created a combination under Section 1, that combination was a sterile one because H.I.S. had no price

maintenance policy. Defendant is therefore entitled to judgment.

**B. The Causality Requirement**

[4, 5] Even if it were determined that Levy implicated H.I.S. in a conspiracy, and that H.I.S. had a price maintenance policy, judgment would still have to be entered for defendant. This result is not reached by any notions of reasonableness. The Court has no authority or competence to assess the reasonableness of a price-fixing scheme. Any such scheme is illegal *per se*. But for the plaintiff to prevail, it must prove that the illegal combination caused its injury. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Greene v. General Foods Corp.*, 517 F.2d 635, 665 (5th Cir. 1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1049, 47 L.Ed.2d 348 (1976); *Terrell v. Household Goods Carrier's Bureau*, 494 F.2d 16, 20 (5th Cir.), *cert. denied*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974). In this case, Belk-Avery has the burden of proving that it was terminated by H.I.S. because it cut prices. Plaintiff has not met its burden. The evidence is overwhelming that H.I.S. refused to deal with Belk-Avery because of its poor credit record and for that reason only. Throughout 1974 and 1975, Belk-Avery routinely failed to pay H.I.S. invoices on time. H.I.S. repeatedly brought the matter to Belk-Avery's attention. On numerous occasions, H.I.S. was compelled to hold or cancel plaintiff's pending orders. In November, 1975, H.I.S. even found it necessary to turn the account over to a collection agency. The relationship between the two companies might have ended then, one year prior to the opening of the Brown Bag, had not H.I.S. relented and given Belk-Avery one more opportunity to prove its credit worthiness. After making a $15,000 deposit, however, Belk-Avery complied with none of the three further conditions to opening a line of credit dictated by H.I.S. During the trial period, Belk-Avery failed to pay invoices on time; it failed to supply H.I.S. with a relia-

---

**7.** It might be that H.I.S., while indulgent of discount pricing from time to time, is intolerant of such pricing as the rule rather than the

exception. On the record presented, however, there is insufficient evidence to warrant such a conclusion.

ble financial statement;[8] it failed to improve its negative trade clearances. As of October, 1976, H.I.S. had placed a hold on further shipments to Belk-Avery. There can be no doubt that this decision was based solely on plaintiff's credit record.[9]

J. R. Avery's call to Morello on November 15 triggered a memorandum on the account to Bert Rosenberg. Rosenberg instructed Morello that, if a line of credit could not be opened, the account should be terminated. The credit department, he stated, was not structured to handle an account on an advance cash payment basis. The Court knows no reason to doubt that Rosenberg's stated rationale was his motivating one. In 1975, H.I.S. installed a computer system to automatically process its selling, shipping, invoicing, and accounting. The computer is not programmed to handle accounts on a cash-in-advance basis. For this reason, H.I.S. deemed Belk-Avery's "trial period" in 1976 a special arrangement and limited it in duration. Thus, when Morello informed Rosenberg that a credit line could not be established based on plaintiff's credit performance, the system dictated the solution. Rosenberg's decision was not counter-intuitive and is not, therefore, suspect. *See Lehrman v. Gulf Oil Corp.*, 464 F.2d at 40–41; *cf. Theatre Enterprise, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). Given plaintiff's credit record and defendant's credit procedures, Rosenberg's decision was eminently reasonable. It follows that his decision was also legal. Defendant's refusal to deal with Belk-Avery had no causal relationship with a combination to fix prices, assuming one existed.

## C. Damages

■ The plaintiff must prove by a preponderance of the evidence the amount of damages sustained as a result of a Sherman Act violation. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). The courts have recognized that where economic harm, particularly future profits, is involved, a plaintiff's proof is necessarily speculative. The Fifth Circuit has held that the " 'wrongdoer should bear the risk of uncertainty that inheres in measuring the harm he causes.' " Note, *Private Treble Damages for Destruction of All or Part of a Business*, 80 Harv.L.Rev. 1566, 1572 (1967); cited in *Copper Liquor, Inc. v. Adolph Coors Co.*, 506 F.2d 934, 953 (5th Cir. 1975); *Greene v. General Foods Corp.*, 517 F.2d at 660. Even assuming that defendant is liable under Section 1, and recognizing the latitude in proof accorded plaintiff, the Court finds that plaintiff has not been damaged.

■ The testimony of those with experience in men's clothing tells the tale. The consensus is that while H.I.S. is a popular brand, it is not unique in quality or price. There are at least a dozen brands of suitings, sport coats, shirts, slacks, and jeans that are competitive with H.I.S. The existence and availability of these substitutes forecloses the possibility of damages.[10] Plaintiff's expert, Dr. Jerry Ingram, inexplicably asserts that there are no good substitutes available. It is only on the assumption that the most minimal substitution is

---

8. Belk-Avery submitted an in-house financial statement on May 17, 1976. The statement's suspect treatment of real estate holdings, a $900,000 debenture bond, and a partially subscribed stock issue rendered it useless to H.I.S. Defendant demonstrated at trial that whereas the statement reflected a profit of $650,000, plaintiff's tax return showed a loss of $250,000. While this fact was unknown to defendant in October, 1976, it had ample reason to demand up-dated financial information from plaintiff at that time.

9. Plaintiff asserts that the opening of the Brown Bag had been announced months in advance of November, 1976. The Court finds from the evidence, however, that Levy was the first H.I.S. employee to learn about the Brown Bag, and he first learned about it on November 3.

10. At most, plaintiff might have suffered damage to the extent of shortages caused by a lag in placing orders with new suppliers. This assumes that plaintiff did not have adequate stocks and that it had not already placed other orders, knowing as early as October that H.I.S. had stopped further shipments. There is no evidence establishing these assumptions as fact.

possible that Dr. Ingram concludes that his "conservative methodology" more than compensates for such substitution. On the contrary, Dr. Ingram's conservative methodology as to certain factors in his computation is offset by his liberal methodology as to other factors.[11] Thus, Dr. Ingram's computation, when critically examined, makes no realistic adjustment for substitution. Defendant's expert testified that, with substitutes easily obtainable, Belk-Avery suffered no losses after the year 1977 and, at most, $2,102 for that year. He seriously doubted, however, whether there was any provable loss at all. The Court shares that doubt and finds that plaintiff suffered no loss as a result of H.I.S.'s refusal to sell after November, 1976.

Some simple facts about Belk-Avery speak more forcefully than the detailed reports of the experts. During the period when H.I.S. shipped to Belk-Avery, two of its university shops folded, followed by a third in early 1977. The surviving university shop, with H.I.S. merchandise no longer available, increased its sales in one year by 18.5 percent. The H.I.S. fashion image evidently did not hold the key to profitability.

## CONCLUSION

Plaintiff has failed to sustain its burden of proof as to liability and damages. Accordingly, judgment will be entered in favor of defendant.

11. Dr. Ingram presents two methods of forecasting lost profits. Forecasting Method One overstates the projected sales for 1977 by relying upon the figure for orders placed. The record of dealings between the companies reveals, however, that orders always exceeded shipments. This error also infects Dr. Ingram's preferred calculation for lost profits in 1977, in that he averaged the result from Method One with that from Method Two to achieve a higher figure.

Method Two incorporates assumptions that exaggerate the damages projected. It fails to compensate for the changing nature of Belk-Avery's outlets. The switch from university shops to discount stores like the Brown Bag undercuts the fundamental premise of Method Two that "the relationship of H.I.S. retail purchases to total men's apparel sales would remain almost the same as in FY 1975 and FY 1976 (6%)." In addition, that six percent figure was calculated by comparing the value of H.I.S. shipments at *retail* with total men's apparel sales *after markdown*. By not accounting for the discount character of Belk-Avery's outlets, Method Two also overstates the markup for H.I.S. merchandise and understates the markdown. Finally, the calculation uses the national average for shrinkage rather than the higher rate experienced by Belk-Avery.