**SPORTS AND TRAVEL MARKETING, INC., Plaintiff,**

v.

**CHICAGO CUTLERY COMPANY and General Housewares Corporation, Defendants.**

**Civ. No. 4–91–37.**

United States District Court, D. Minnesota, Fourth Division.

Jan. 26, 1993.

---

James H. Curtin, and Dorsey & Whitney, Minneapolis, MN, for plaintiff.

James P. Larkin, Thomas J. Seymour, and Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, MN, for defendants.

## ORDER

DOTY, District Judge.

This matter is before the court on defendants' motion for summary judgment. Based on a review of the file, record and proceedings herein, the court grants defendants' motion.

## BACKGROUND

Plaintiff Sports & Travel Marketing, Inc. ("STM") brought the present action alleging eight state law claims arising out of the termination of a manufacturer's representative agreement between STM and defendant Chicago Cutlery Company.[1] Chicago Cutlery is a wholly owned subsidiary of defendant General Housewares Corporation ("GHC"). In 1989, the sales and marketing functions of GHC and Chicago Cutlery were consolidated.

STM represents various manufacturers in the distribution of their products, primarily to premium and incentive accounts. Roy K. Erickson ("Erickson") is the president, chief executive officer and sole shareholder of STM. Erickson had been a vice-president of Chicago Cutlery Company, and left Chicago Cutlery to form STM in 1986. STM entered into a premium and incentive manufacturer's representative agreement with Chicago Cutlery on June 25, 1987. The parties added various provisions to the

agreement on November 13, 1987, and July 29, 1988.[2] STM and defendants operated under this agreement for over three years.

Under the agreement, STM became a manufacturer's representative to sell Chicago Cutlery's products to the premium and incentive trade class. The agreement provided that STM was to be responsible for customer billing and pricing, and that Chicago Cutlery was to ship products directly to the customer. The contract was non-exclusive and provided Chicago Cutlery with the right:

to appoint other distributors, manufacturers' reps or dealers covering the same products, customers and territories during the term of this Agreement.

The contract was also terminable by either party on thirty days written notice and provided Chicago Cutlery the right to establish house accounts on thirty days notice.

The agreement further included an integration clause that provided that all agreements by the parties and all of the terms of the contract between the parties were included in the written agreement, and that:

No term, understanding or agreement not specifically incorporated within this document shall be binding upon either Chicago Cutlery, STM or Roy K. Erickson.

In a letter dated June 26, 1986, one day after the agreement had been signed, Erickson wrote to Ronald J. Gangelhoff, who was at that time the time president and chief executive officer of Chicago Cutlery, acknowledging the non-exclusive nature of the contract, but also seeking to assert certain verbal agreements.[3] Carla J. Ward, an executive vice-president of Chicago Cutlery, immediately wrote a letter in response, stating that:

**1.** Chicago Cutlery Company was later merged into Chicago Cutlery, Inc. For purposes of defendants' motion, Chicago Cutlery, Inc. will be referred to as Chicago Cutlery.

**2.** The November 13, 1987 addendum established the Maritz account as a commission account and set the pricing for a cutlery product line. The addendum dated July 29, 1988, established S & H Motivation as a commission account.

**3.** Erickson's letter specifically mentioned Chicago Cutlery's alleged verbal agreement to:

1) limit Ed Van Rossum's future premium and incentive activities to only those accounts he has now, and
2) refer any future inquiries regarding premium and incentive business that Chicago Cutlery receives to me for handling and follow up....

*Id.*

While I understand you did discuss the issues outlined in your letter, I just want you to know that there is no intention to create any enforceable oral or written agreements beyond the Premium and Incentive Manufacturers Rep Agreement you signed.

In 1988, GHC purchased all of the stock in Chicago Cutlery. In the fall of 1987, GHC consolidated the sales and marketing functions of Chicago Cutlery with those of its own cookware group. In August of 1989, Erickson made a formal presentation to GHC in an effort to convince GHC to retain STM as a Chicago Cutlery representative. During his presentation, Erickson acknowledged defendants' right to terminate their agreement on thirty days notice. His outline for that presentation also refers to the thirty-day termination clause.

After the presentation, the parties began to negotiate and GHC ultimately offered STM a new manufacturer's representative agreement. Under the proposed agreement, STM would continue to act as a premium and incentive sales representative for Chicago Cutlery products and receive a straight sales commission of eight percent. Brian Adkinson, GHC's national sales manager at that time, presented the proposal to Erickson. Adkinson contends that Erickson responded angrily, and that Adkinson felt compelled to terminate the meeting, fearing for his physical safety.[4]

After his meeting with Adkinson, Erickson mailed a letter to GHC's vice-president of sales and marketing, Scott Fawcett, on October 6, 1989, suggesting that the parties' relationship should continue as before. Fawcett responded by offering to pay STM a fifteen percent commission rate. Fawcett believed that Erickson subsequently agreed to his offer, and prepared a written agreement on that basis. However, when he returned the agreement, Erickson added various terms that GHC was unwilling to accept. Shortly thereafter, defendants decided to terminate STM.

Defendants cite several reasons for that decision. GHC did not want to maintain any type of buy-sell relationship with STM because such an arrangement was inconsistent with the manner in which GHC wanted to distribute its products. GHC viewed STM's business as having questionable value to GHC and perceived that Erickson's objectives differed significantly from those of GHC. GHC also wanted to bring STM's contract in line with those of its other representatives. Defendants finally cite Erickson's alleged poor attitude, his treatment of Adkinson, with whom he would have been working, and customer complaints as other reasons for the decision to terminate STM.[5]

In a letter dated December 1, 1989, Chicago Cutlery notified STM of the decision to terminate the parties' agreement effective December 31, 1989 and informed STM that commissions would be paid on all orders shipped prior to December 31. Chicago Cutlery filled all STM orders that called for immediate shipment and were submitted on or before December 31, 1989. STM submitted one purchase order, dated December 12, 1989, that requested shipment of 1,800 units on six different dates, starting with January 1, 1990. GHC filled only the first installment. All other orders were filled and STM either received its commission or resold the goods and made a profit. STM submitted no orders after December 31, 1989.

Chicago Cutlery appointed Premco as its premium and incentive representative effective January 1, 1990. Premco had been the premium and incentive representative for GHC's cookware products since May of 1989. After STM rejected the offer to serve as GHC's manufacturing representative for a commission of fifteen percent, Premco accepted a similar offer on a ten percent commission basis.

Letters were sent out to Chicago Cutlery customers who had previously dealt with STM informing them that STM had been terminated as Chicago Cutlery's represen-

---

**4.** Erickson has conceded that he used "unwarranted language."

**5.** One customer had complained to GHC about Erickson's language, while several other accounts complained of Erickson's performance.

tative and that Premco would be taking over that role. Defendants contend that Premco played no role in GHC's decision to terminate STM, and proffer evidence that Premco had never heard of STM before it entered into an agreement to represent GHC in the cutlery products premium and incentive market.

Following STM's termination, it brought the present action asserting eight state law claims:

1. Breach of contract;
2. Wrongful termination;
3. Unjust enrichment;
4. Tortious interference with contract and prospective contractual advantage;
5. Tortious interference with contract and prospective economic advantage;
6. Breach of implied covenant of good faith;
7. Antitrust violations; and
8. Defamation.

Plaintiff's Complaint at ¶¶ 42–47. Defendants now move for summary judgment on all eight counts. The court will address the relevant facts and law for each claim in turn.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which requires the trial judge to direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Stated in the negative, summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. In order for the moving party to prevail, it must demonstrate to the court

that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552. With this standard at hand, the court will consider defendants' motion for summary judgment.

### 1. *STM's Breach of Contract Claim*

Count I of STM's complaint alleges that defendants' conduct violated the:

express and implied terms of the agreement between the parties, the customs and usages of the [premium and incentive] trade, and the parties' course of dealing and performance since entering the agreement.

Plaintiff's Complaint ¶ 43. STM asserts seven specific breaches:

1. Defendants' refusal to honor orders placed by STM "for contracts and offers secured by STM before the purported termination of STM";
2. Defendants' alleged attempt to convert STM's customer accounts into defendants' in-house accounts in violation of the 1986 agreement;
3. Defendants' attempts to bill STM customers directly;
4. Defendants' failure to fill orders in a timely fashion;
5. Defendants' failure to make timely payment of commission checks due STM;

6. Defendants' placing an improper credit hold on STM's account; and

7. Defendants' attempts to terminate STM's representative agreement without good cause.

Defendants contend that STM's breach of contract claim fails because only one of the seven allegations falls within the express terms of the agreement, that is, defendants violated the agreement by attempting to convert STM's accounts to in-house accounts, and that STM fails to proffer any evidence to support that one allegation.

■ Parties to an express contract are entitled to have their rights and duties adjudicated exclusively by its terms. *See, e.g., In re Stevenson Assocs., Inc.,* 777 F.2d 415, 421 (8th Cir.1985) (citing *Starr v. Starr,* 312 Minn. 561, 251 N.W.2d 341, 342 (1977) (per curiam) & *Carl Bolander & Sons, Inc. v. United Stockyards Corp.,* 298 Minn. 428, 215 N.W.2d 473, 476 (1974)). If the language of the agreement is unambiguous, the court is to construe its terms. *Rooney v. Dayton–Hudson Corp.,* 310 Minn. 256, 246 N.W.2d 170, 173 (1976) (citation omitted).[6] Applying that standard, the court finds that the termination provision is complete and clearly provides that either party could terminate the contract at will upon thirty days notice. Erickson has also acknowledged his awareness of the termination clause. It is undisputed that notice of termination was mailed to STM on December 1, 1989, stating that:

This letter is to officially notify you that under the provisions of the June 24, 1986 Premium Incentive Manufacturers Rep Agreement between Chicago Cutlery, Inc. and Sports & Travel Marketing, we hereby give proper notification of termination effective December 1, 1989.

**6.** The parties' agreement provides that the contract be construed according to Minnesota law. The parties do not dispute that provision, thus the court applied Minnesota law to construe the terms of the agreement.

**7.** STM has also admitted that all orders placed prior to December 31, 1989, were filled with the exception of orders placed before that date which requested shipment after that date.

(Letter from Fawcett to Erickson of 12/1/89). The notice further stated that:

Commissions will be paid only on orders shipped through December 31, 1989.

*Id.* All orders submitted by STM on or before December 31, 1989, and requesting immediate shipment, were filled by defendants.[7] The court thus concludes that under the terms of the agreement, and pursuant to Chicago Cutlery's notice of termination, as of December 31, 1989, the agreement was terminated and Chicago Cutlery was under no further obligation to sell its products to STM.

■ The court also rejects STM's attempt to impose such an obligation by arguing that the agreement had been modified by the parties' course of dealing or custom and usage in the premium and incentive trade.[8] First, a party is generally not entitled to lost future profits arising from a contract that is terminable at will. *See, e.g., Sofa Gallery, Inc. v. Stratford Co.,* 872 F.2d 259, 263 (8th Cir.1989) (applying Minnesota law). Moreover, several provisions of the agreement expressly preclude such modification. The agreement provides that it could be modified:

only by written agreement signed by both an officer of Chicago Cutlery and Roy K. Erickson.

The agreement further states that it:

contains all of the agreements and understandings between Chicago Cutlery and STM or Roy Erickson relating to the relationship between the parties and supersedes any and all prior agreements or understandings.

The agreement also provides that:

no term, understanding, or agreement not specifically incorporated within this document shall be binding upon either

**8.** STM argues that it does not seek to deny or avoid the express terms of the agreement, but instead seeks to rely:

on Chicago Cutlery's and GHC's subsequent conduct in performance of the 1986 agreement. Such subsequent conduct by the parties can modify the written terms of the contract.

(Plf.'s Mem.Opp.Summ.J.Mot. at 2.)

Chicago Cutlery, STM, or Roy K. Erickson.

Thus, the agreement clearly sets forth the procedure by which the agreement could be modified [9] and the understanding that neither party was to be bound by any term or understanding outside the agreement itself.[10]

STM also contends that a letter written by Fawcett, dated December 5, 1989, modifies the terms of the parties' agreement. It is undisputed, however, that STM did not comply with the provisions of the agreement in an attempt to modify its terms, and STM fails to proffer any written modification signed by both an officer of Chicago Cutlery and Erickson. Moreover, examining Fawcett's letter of December 5, 1989, the court concludes that it in no way retracts from the language in the notice of termination, which clearly states that the agreement was to be terminated as of December 31, 1989, and that defendants would pay commissions only on those orders shipped prior to that date.[11] The court thus rejects STM's contention that the parties' agreement was modified by Fawcett's letter of December 5, 1989.

■ STM also fails to proffer any evidence establishing a course of dealing between the parties. STM seeks to rely on one single instance where Chicago Cutlery allegedly continued to pay a representative commissions after STM assumed responsibility for an account.[12] The transfer of that account, however, occurred after the parties entered into the 1986 agreement, and thus, under Minnesota law cannot constitute a course of dealing by which the 1986 agreement can be modified or interpreted. *See* Minn.Stat. § 336.1–205(1) cmt. (stating that "subsection (1) restricts 'course of dealing' to a sequence of previous conduct between the parties").

In summary, the court concludes that the parties' agreement represented their entire understanding, was complete, unambiguous and not modified in any manner. Thus, the only claims for breach of contract which STM may assert are those based on acts that allegedly violate the express terms of the agreement. *See, e.g., In re Stevenson Associates, Inc.,* 777 F.2d at 421. Only one breach asserted by STM, based on defendants' alleged attempt to convert STM customer accounts to in-house accounts, could possibly violate the express terms of the agreement. However, STM proffers no evidence that defendants ever converted any accounts to in-house accounts. All of the other alleged breaches do not involve the express terms of the parties' agreement, and thus are fatally flawed.

Based on the foregoing, the court grants defendants' motion for summary judgment on STM's breach of contract claims as set forth in Count I.

2. *STM's Wrongful Termination Claim*

■ Count II of STM's complaint asserts a claim of wrongful termination. In its complaint, STM alleges that it successfully performed its duties under the agreement, and that before termination it was entitled to notice of defects in performance and an

9. The court thus finds the two cases on which STM relies distinguishable because neither involved a written contract provision which set forth the procedures required to validly modify the existing agreement. *See Huver by Huver v. Opatz,* 392 N.W.2d 237, 241 (Minn.1986); *In re R. Bastyr & Assocs., Inc.,* 81 B.R. 978, 982–83 (Bankr.D.Minn.1988).

STM further relies on Minn.Stat. § 325E.37. That statute, however, applies only to sales representative agreements that were either entered into or renewed after July 31, 1990. STM's agreement was terminated as of December 31, 1989, and thus that provision does not apply.

10. Not only does the agreement expressly set forth that understanding, Chicago Cutlery confirmed it shortly after Erickson signed the agreement, stating that the contract represented the parties' entire agreement, and that Chicago Cutlery would not be bound by any term not found in the agreement. (Letter from Ward to Erickson of 7/11/86).

11. The letter explicitly provides that:

All orders in house during the termination period on Sports and Travel Marketing/Premium Incentive Sales purchase orders will be honored under the terms of the June 25, 1986 contract between Sports and Travel Marketing and Chicago Cutlery.

(Letter from Fawcett to Erickson of 12/5/89).

12. STM's allegation involves the Maritz account.

opportunity to cure. STM contends that without such notice and opportunity to cure, defendants' termination was neither for good cause nor with reasonable notice, and thus constitutes a breach of the express and implied terms of the agreement.

The court, however, rejects STM's contention. No term of the agreement requires cause for termination. As previously discussed, the agreement was terminable at will, providing that:

> Either party may, in its sole discretion, terminate this Agreement at any time upon thirty (30) days written notice to the other party.

The court finds that the provision is complete and unambiguous, and thus rejects STM's claim that the contract required cause for termination. *See, e.g., RJM Sales & Mktg. v. Banfi Prods.*, 546 F.Supp. 1368, 1374–75 (D.Minn.1982) (applying Minnesota law to construe nearly identical termination provision and finding that cause was not required for termination); *see also Mason v. Farmers Ins. Cos.*, 281 N.W.2d 344, 347 (Minn.1979). Thus, defendants were free to terminate the contract with or without cause, as long as they provided STM with written notice thirty days prior to such termination.[13]

The court previously determined that defendants' termination complied with the express terms of the written agreement.[14] Moreover, even though cause was not required, defendants proffer legitimate reasons for the decision to terminate the agreement with STM. The court thus rejects STM's contention that its termination violated the express terms of the agreement.

In its memorandum in opposition, STM offers another argument to support its claim of wrongful termination:

> STM acknowledges that GHC could have terminated it without cause.... Rather, STM challenges the legality of GHC's

use of the threat of termination in conjunction with its offer of a one-sided straight-commission agreement with no provision for protecting STM's pre-termination booked business....

(Pl.'s Mem.Opp.Summ.J.Mot. at 26.)

The court first rejects STM's argument because no term of the parties' agreement, either express or implied, provided any protection for STM's pre-termination business. STM was free to bargain for such protection at the time the parties entered into the agreement but failed to do so.

STM also seeks to argue that the termination clause was unconscionable. Unconscionability is to be determined "at the time of the making of the contract." Minn.Stat. § 336.2–302 & cmt. 1 ("The basic test is whether ... the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.") STM, however, fails to allege any facts or proffer any evidence to support a claim that the contract was unconscionable at the time it was made.[15]

To establish unconscionability, a party must demonstrate that it had no meaningful choice but to deal with the other party and to "accept the contract as offered." *RJM Sales & Mktg.*, 546 F.Supp. at 1374–75. Construing an almost identical termination clause, the court in *RJM* specifically found that it was not unconscionable. *Id.* at 1375. Like the plaintiff in *RJM*, STM was not forced to enter into a contract with Chicago Cutlery, but was free to contract, as it later did, with other manufacturers. STM's business experience and its ability to represent other manufacturers thus demonstrates that it had meaningful choices other than entering into the parties' agreement.

The court further concludes that the termination clause was not unreasonably fa-

---

**13.** Erickson has also acknowledged that defendants' right to terminate the agreement.

**14.** STM was given notice of termination by letter of December 1, 1989, setting the termination date as December 31, 1989. *See supra.*

**15.** The court further notes that one day after the agreement was executed, Erickson wrote to the president and chief executive officer of Chicago Cutlery, stating that he was pleased with the agreement. (Letter from Erickson to Gangelhoff of 6/26/86.)

vorable to Chicago Cutlery. In *RJM*, the court found as a matter of law that:

> The termination clause is also not "unreasonably favorable," [because] the clause allowed either party to terminate the contract on 30 days notice.

*Id.* The termination clause in the Chicago Cutlery agreement also permitted either party to terminate on thirty days notice. Moreover, one day after the agreement was entered, Erickson wrote to the president of Chicago Cutlery, stating that:

> I'm confident [the agreement] will be good for both Chicago Cutlery, you and me.

(Letter from Erickson to Gangelhoff of 6/26/86.) The court thus concludes that the clause was not unreasonably favorable to defendants and rejects STM's contention that the termination clause was unconscionable.

The court finally determines that STM proffers no evidence that defendants improperly threatened STM during the negotiations prior to STM's termination. It is undisputed that the last negotiations for a straight commission agreement took place on or about November 7, 1989. (*See* Plf.'s Mem.Opp.Summ.J.Mot. at 15.) STM alleges that it first received an indication of its termination on December 5, 1989. Thus, STM's recitation of the facts undermines its contention that defendants' improperly threatened to terminate the agreement. The court concludes that the negotiations between the parties merely broke down, and defendants terminated the agreement according to its express terms.

Based on the foregoing, the court concludes that STM's wrongful termination claim is fatally flawed and grants defendants' motion for summary judgment on Count II of the complaint.

### 3. *Unjust Enrichment*

■ In Count III of its complaint, STM asserts a claim of unjust enrichment. STM claims that by encouraging it to build up sales of Chicago Cutlery products and to make substantial investments of time and money in reliance on a continuing relationship, defendants' termination of the par-

ties' agreement resulted in their unjust enrichment.

■ Minnesota law provides that "equitable relief cannot be granted where the rights of the parties are governed by a valid contract." *United States Fire Ins. v. Minnesota State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn.1982) (citing *Cady v. Bush*, 283 Minn. 105, 166 N.W.2d 358 (1969)). As previously discussed, the court determines that the parties' agreement was complete and unambiguous, and defendants complied with its express terms when terminating STM. In its complaint, STM alleges that the acts underlying its unjust enrichment claim as evidence of defendants' breach of the parties' agreement. As the Minnesota Supreme Court stated in *Schimmelpfennig v. Gaedke:*

> Where there is an express contract, there can be no contract implied in fact or quasi contractual liability with respect to the same subject matter. The express contract excludes both.

223 Minn. 542, 27 N.W.2d 416, 420 (1947) (citation omitted). Because the same subject matter underlies both the unjust enrichment and breach of contract claims, the court concludes that STM's unjust enrichment claim fails as a matter of law.

■ Moreover, to support a claim of unjust enrichment, "it must be shown that the term 'unjustly' could mean illegally or unlawfully." *First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn. 1981). Examining the record, the court concludes that none of defendants' actions may be characterized as either illegal or unlawful. There is also no basis on which STM could reasonably rely for its belief that Chicago Cutlery would continue the parties' relationship indefinitely. The court thus concludes that STM's unjust enrichment claim fails as a matter of law and grants defendants' motion on Count III of the complaint.

### 4. *STM's Tortious Interference With Contract or Prospective Contractual Advantage As Set Forth in Count IV*

■ In Count IV, STM alleges that defendants interfered with its contractual re-

lationships and prospective contractual advantage by failing to prevent the conversion of STM's customers to either in-house or commission accounts. STM further alleges that defendants improperly transferred accounts to Premco with the knowledge that such actions would harm STM financially. STM contends that after building its business and investing the time and effort to secure its contracts for 1990, defendants directly contacted STM's customers and refused to fill booked orders, and thus STM was not able to realize the benefits of its efforts. (Pl.'s Mem. Opp.Sum.J.Mot. at 32.) STM contends that defendants's refusal to fill its orders constitutes tortious interference. STM, however, fails to identify any actual contract with which defendants interfered.

■ To support a claim for tortious interference with a contract, the Minnesota Court of Appeals stated that:

> Recovery may be had for inducing breach of contract by establishing (1) the existence of a contract; (2) alleged wrong-doers' knowledge of the contract; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom.

*Lee v. Metropolitan Airport Comm'n,* 428 N.W.2d 815, 822 (Minn.Ct.App.1988) (citing *Royal Realty Co. v. Levin,* 244 Minn. 288, 69 N.W.2d 667, 671 (1955)). To support a claim of tortious interference with a prospective contractual advantage, a plaintiff must prove that "a defendant intentionally committed a wrongful act that improperly interfered with [a] prospective [contractual] relationship. *Hunt v. University of Minnesota,* 465 N.W.2d 88, 95 (Minn.Ct. App.1991) (citing *United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 633 (Minn.1982)). Without evidence that a defendant's wrongful conduct influenced a prospective customer's decision to enter into a contract, summary judgment is appropriate. *Id.* at 95–96.

Applying those factors, the court determines that STM's claim fails as a matter of law. STM proffers no evidence of any contract between STM and any third party that was either breached or otherwise interfered with as a result of defendants' actions. Thus, STM can show no tortious interference with any existing contract.

Turning to STM's claim concerning interference with prospective contractual advantage, the parties' agreement specifically provided that during the term of STM's agreement, Chicago Cutlery had the right to appoint other representatives to sell the same products to the same customers in the same territory. Defendants thus retained the right to appoint a new representative to solicit accounts doing business through STM even if its manufacturing relationship had not been terminated. The court concludes that after termination, defendants remained free to either solicit accounts or appoint other representatives to solicit accounts that previously had done business through STM. Thus, defendants actions were not wrongful and fail to support a claim of tortious interference. *Id.* at 95–96 (summary judgment is appropriate where plaintiff fails to proffer evidence of defendants' wrongful conduct which influenced a prospective customer's decision to enter into a contract).

The court further concludes that under the clear terms of the parties' agreement, after its termination STM had no right to either represent Chicago Cutlery or retain Chicago Cutlery customers, and thus it had no reasonable basis for its expectation that any prospective contracts would survive its termination.[16] Moreover, the losses of which STM complains were the foreseeable consequences of its termination. The court therefore concludes that defendants properly solicited orders with accounts that were doing business through STM prior to its termination, and that defendants' activities fail to support a claim of tortious interference with a prospective contractual ad-

---

16. After the agreement was entered, Erickson wrote that he was prepared:

> to go forward and develop an effective premium and incentive business *for Chicago Cutlery.*

(Letter from Erickson to Gangelhoff of 6/26/86 at 1) (emphasis added).

vantage. *See Beer Wholesalers, Inc. v. Miller Brewing Co.*, 426 N.W.2d 438, 442 (Minn.Ct.App.1988), *cert. denied*, 489 U.S. 1039, 109 S.Ct. 1173, 103 L.Ed.2d 235 (1989).

Based on the foregoing, the court concludes that STM fails to demonstrate that any contract with a third party has been breached, or that defendants engaged in any wrongful conduct or interfered with any prospective contractual advantage, and thus grants defendants' motion for summary judgment on Count IV of the complaint.

### 5. *STM's Tortious Interference With Contract or Prospective Contractual Advantage As Set Forth In Count V*

In Count V of its complaint, STM asserts a second claim of tortious interference based in part on the same conduct alleged in Count IV but adding another allegation concerning defendants' "termination of the P & I Agreement with STM and its refusal to honor contracts with STM's customers which predate the attempted termination...." As previously determined, defendants properly terminated the parties' agreement, and thus STM fails to demonstrate any wrongful conduct to support its allegation that defendants somehow tortiously interfered with the agreement. *Hunt*, 465 N.W.2d at 95–96 (to support such a claim, plaintiff must proffer evidence of defendants' wrongful conduct); *cf. Hansen v. Barrett*, 183 F.Supp. 831, 833 (D.Minn.1960) (contract which is terminable at will cannot form the basis of a tortious interference claim); *but see Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 504–06 (Minn.1991) (plaintiff may assert claim of tortious interference based on a contract that is terminable at will).

The rest of the allegations of tortious interference set forth in Count V arise from the same conduct asserted in Count IV. For the reasons previously set forth, the court concludes those allegations are fatally flawed. Accordingly, the court grants defendants' motion for summary judgment on Count V of STM's complaint.

### 6. *STM's Claim of Breach of An Implied Covenant of Good Faith*

In Count VI, STM alleges that it successfully performed its duties under the agreement, and that defendants' conduct breached an implied covenant of good faith. In its memorandum, STM further alleges defendants breached that covenant by preventing STM from fulfilling "commitments for its customers 'booked' into 1990." (Pl.'s Mem.Opp.Summ.J.Mot. at 28.)

The court first rejects STM's claim that defendants were required to fill any orders calling for delivery after December 31, 1989, the date on which the agreement was terminated. Under the clear terms of the parties' agreement, defendants had no ongoing obligation to supply STM with Chicago Cutlery products after that date.

Minnesota law does not favor claims based on the breach of an implied covenant of good faith and fair dealing, *see Lee*, 428 N.W.2d at 822, and does not recognize an independent cause of action for such a breach if it arises from the same conduct underlying a breach of contract claim. *See International Travel Arrangers v. NWA, Inc.*, 723 F.Supp. 141, 152–53 (D.Minn.1989) (construing Minnesota cases). Moreover, where a party's actions do not prevent another party from performing the contract, there is no breach of the implied covenant of good faith and fair dealing. *American Warehousing & Distrib., Inc. v. Michael Ede Mgmt., Inc.*, 414 N.W.2d 554, 557–58 (Minn.Ct.App.1987).

Applying that standard, the court concludes that STM's claim fails because it is based on the same conduct underlying its breach of contract claim. Moreover, defendants did not improperly prevent STM from performing the terms of the parties' agreement, they merely terminated the agreement in accordance with its terms. Defendants proffer substantial evidence in support of their decision to terminate STM, and STM fails to proffer any evidence of defendants' bad faith or unfair dealing. The court thus concludes that STM's claim is fatally flawed and that defendants were

not obligated to provide STM with products after the date of termination.[17]

▪ In paragraph 68 of STM's complaint, it also alleges that defendants' conduct constitutes bad faith destruction of STM's legitimate expectancies. Minnesota law, however, does not recognize bad faith termination of a contract as giving rise to a cause of action independent of the contractual claim. *See, e.g., Wild v. Rarig,* 234 N.W.2d 775, 789–92 (Minn.1975). The court thus rejects STM's claim that defendants' conduct constitutes bad faith termination of the parties' agreement.

Based on the foregoing, the court concludes that STM's claim that defendants breached an implied covenant of good faith and fair dealing fails as a matter of law, and grants defendants' motion for summary judgment on Count VI of the complaint.

### 7. *STM's Antitrust Claim*

In Count VII of the complaint, STM alleges that the following actions constitute unreasonable and unlawful restraints of trade in violation of Minn.Stat. § 325D.53, subd. 1: defendants' refusal to deal with STM, their refusal to fill orders with customers under contracts which predated the termination, their entry into contracts with STM's customers and their assignment of customer accounts to Premco.

▪ STM seeks to prove the existence of a combination or conspiracy between defendants and Premco. To do so, it must produce evidence that tends to exclude the possibility of unilateral action. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).[18]

Examining STM's evidence concerning defendants and Premco, the court concludes that it does not tend to exclude the possibility of independent action. STM contends that GHC's negotiations with Premco to begin sales in the premium and incentive market for Chicago Cutlery products occurred while STM was still representing GHC in the same field, and thus GHC's conduct somehow suggests a conspiracy to violate Minnesota antitrust law. Such negotiations, however, were expressly permitted under the terms of the parties' agreement, which was clearly non-exclusive. Defendants were thus free to negotiate with and appoint Premco whether they terminated or continued STM's agreement. STM proffers no evidence that the pretermination contract between GHC and Premco was anything other than GHC's attempt to assure continuity of representation after it terminated STM. Moreover, STM proffers no evidence that Premco was involved in defendants' decision to terminate STM, and indeed STM's termination was not required before Premco entered into an agreement with defendants. The court thus concludes that STM fails proffer evidence that would tend to exclude unilateral action and fails to raise a material fact dispute concerning the existence of a combination or conspiracy between defendants and Premco.

▪ Based on the foregoing, STM's antitrust claim is fatally flawed because it fails to raise a material fact dispute concerning the existence of a combination or conspiracy. The court rejects STM's claim that defendants somehow conspired with Premco, and its remaining allegations are based on conduct involving only GHC, and its wholly owned subsidiary, Chicago Cut-

---

**17.** In support of its claim, STM cites various cases that do not involve the application of Minnesota law. The parties' agreement expressly states that it is to be construed according to Minnesota law, and thus the court declines to apply those cases.

**18.** In the absence of Minnesota precedent, the court applied well established principles of federal antitrust law because:

Minnesota courts have consistently held that Minnesota antitrust law is to be interpreted

consistently with the federal courts' construction of federal antitrust law.

Therefore we conclude Minnesota antitrust law should be interpreted consistently with federal court interpretations of the Sherman Act unless state law is clearly in conflict with federal law.

*State by Humphrey v. Alpine Air Prods.,* 490 N.W.2d 888, 894 (Minn.Ct.App.1992) (citing Minnesota cases).

lery. Under Minnesota law, a corporation cannot conspire with itself. *Stock v. Heiner*, 696 F.Supp. 1253, 1262 (D.Minn.1988) (applying Minnesota law to a claim alleging conspiracy to defame). Similarly, a wholly owned subsidiary cannot conspire with its parent corporation. *See Copperweld Corp. v. Independent Tube Corp.*, 467 U.S. 752, 770–73, 104 S.Ct. 2731, 2741–43, 81 L.Ed.2d 628 (1984). Absent evidence of a combination or conspiracy, a manufacturer may exercise its right to refuse to deal with a customer. *Cf. Belk–Avery, Inc. v. Henry I. Siegel Co., Inc.*, 457 F.Supp. 1330, 1334 (M.D.Ala.1978) (citing *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919)). Thus, defendants' refusal to deal with STM does not constitute an illegal combination or conspiracy. *See Colgate*, 250 U.S. at 307, 39 S.Ct. at 468 (1919) (such a unilateral refusal to deal is legal). The court thus concludes that STM's antitrust claim under Minnesota law fails because there is no evidence of a combination or conspiracy.

STM also suggests that there was a conspiracy or agreement to fix prices in violation of Minnesota antitrust law. (Pl.'s Mem.Opp.Summ.J.Mot. at 34 n. 16.) The court, however, rejects that suggestion because STM proffers no evidence to support any claim of price fixing.

Based on the foregoing, the court concludes STM's antitrust claim is fatally flawed because it fails to raise a material fact dispute concerning the existence of a contract, conspiracy or combination. The court thus grants defendants' motion for summary judgment on STM's antitrust claim under Minn.Stat. § 325D.53, subd. 1, as set forth in Count VII of the complaint.

### 8. *STM's Defamation Claim*

In Count VIII of the complaint, STM asserts a claim of defamation. It subsequently advised defendants that it would dismiss its defamation claim with prejudice.

Examining the record, the court further concludes that STM fails to raise a material fact dispute concerning that claim. The court thus grants defendants' motion for summary judgment on STM's defamation claim as set forth in Count VII of the complaint.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment on plaintiff's breach of contract claim set forth in Count I of the complaint is granted;

2. Defendants' motion for summary judgment on plaintiff's claim of wrongful termination set forth in Count II of the complaint is granted;

3. Defendants' motion for summary judgment on plaintiff's unjust enrichment claim set forth in Count III of the complaint is granted;

4. Defendants' motion for summary judgment on plaintiff's claim of tortious interference with contract or prospective contractual advantage set forth in Count IV of the complaint is granted;

5. Defendants' motion for summary judgment on plaintiff's claim of tortious interference with contract or prospective contractual advantage set forth in Count V of the complaint is granted;

6. Defendants' motion for summary judgment on plaintiff's claim of breach of an implied covenant of good faith and fair dealing set forth in Count VI of the complaint is granted;

7. Defendants' motion for summary judgment on plaintiff's antitrust claim set forth in Count VII of the complaint is granted; and

8. Defendants' motion for summary judgment on plaintiff's defamation claim set forth in Count VIII of the complaint is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.