**Shirley HUNT, Appellant,**

v.

**UNIVERSITY OF MINNESOTA and Stan Kegler, individually, Respondents.**

**No. CX–90–1433.**

Court of Appeals of Minnesota.

Jan. 15, 1991.

James V. Roth, Lawrence P. Schaefer, Leonard, Street and Deinard, Minneapolis, for appellant.

Rita A. McConnell, Minneapolis, for respondents.

Considered and decided by RANDALL, P.J., and FORSBERG and SHORT, JJ.

## OPINION

SHORT, Judge.

This defamation action arose when Stanley Kegler, the University of Minnesota's Vice President for Institutional Affairs, gave an unfavorable reference to a prospective employer of Shirley Hunt. On appeal from an award of summary judgment in favor of the University and Kegler, Hunt argues the trial court erred in (1) ruling there was no jury issue on malice and Kegler's statements were conditionally privileged because they were given in the context of a job reference; (2) concluding Kegler's statements were constitutionally protected free speech; and (3) denying her motion to amend her complaint to include claims for tortious interference with prospective business relations and punitive damages. We disagree and affirm.

## FACTS

From May of 1984 until October of 1986, Shirley Hunt worked for the University of Minnesota as coordinator for external relations and assistant to the vice president for the Institute of Agriculture, Forestry and Home Economics (IAFHE). Hunt worked closely with IAFHE Vice President Richard Sauer to develop and carry out Institute-wide programs. Hunt also represented the IAFHE at the state legislature.

While Hunt was employed at the University, Stanley Kegler was the University's Vice President for Institutional Relations. Kegler was the chief lobbyist for the University at the state legislature. Kegler and Hunt did not work together in the lobbying efforts. In a memo to Sauer dated May of 1985, Hunt wrote her relationship with Kegler needed improvement. She believed Kegler ignored her presence at the legislature. For example, Kegler neglected to give Hunt a copy of a newsletter which he distributed in a committee meeting room. Kegler also neglected to give her a candy cigar which he was distributing to celebrate his daughter's birth. Nonetheless, Hunt admitted Kegler had no particular animosity towards her. At the end of the 1986 session, Hunt even told Sauer her relationship with Kegler had greatly improved.

Several university officials told Sauer they disliked Hunt's work. In early 1986, Sauer decided not to renew Hunt's contract for the following year. Sauer told Hunt she was being released because of differences in their personal styles, one of which was Hunt's lack of warmth. Because of Hunt's efforts during the 1986 legislative session, however, Sauer gave her a positive recommendation.

In May of 1986, Hunt applied for a position as Intergovernmental Coordinator with Hennepin County. Hunt knew the position was a political appointment. By October of 1986, Hunt (a republican) and Jim Stabler (a democrat) were the two finalists for the position. At that time, the partisan compo-

sition of the Hennepin County Board was four democrats to three republicans. Three democrats supported Stabler, three republicans supported Hunt and one democrat, Commissioner Mark Andrew, leaned toward Hunt. Andrew warned Hunt the hiring process had become politicized and the Board might have to compromise to fill the position.

Eventually, someone proposed two co-coordinators be hired. This unpopular proposal was laid over until the Hennepin County board meeting in January of 1987. But by the end of December, Andrew learned from several sources that his support of Hunt was not well-founded. He discovered Hunt's contract with the University had not been renewed, and decided to check her references. Hunt believed the Board had decided to appoint Stabler and contacted her references to find reasons to support its decision.

On January 5, Andrew called Kegler to ask his opinion of Hunt's performance at the legislature. Although Hunt had not listed Kegler as a reference, Kegler and Andrew had been acquaintances for approximately 10 years and Andrew trusted Kegler. Andrew does not remember the exact words which Kegler used to describe Hunt's performance, but does recall Kegler's opinion was not complimentary. Andrew repeated Kegler's assessment of Hunt's work to a Hennepin County staff member who then disseminated the information to the rest of the board.

Hunt quickly learned from one of her supporters Kegler had given her an unsatisfactory reference. On the evening of January 5, Hunt called Kegler to find out what he had told Andrew. Kegler said he told Andrew that Hunt had trouble dealing with legislators because she lacked warmth, was insincere, and had no sense of integrity. Kegler gave Andrew this information in confidence. Kegler maintains he also told Andrew he rarely saw Hunt at work and other people could give Andrew a more accurate assessment of Hunt's performance.

At the January 6 meeting, the Hennepin County board voted along party lines to appoint Jim Stabler as Intergovernmental Coordinator. A few days later, the Board hired Hunt on a contract basis to lobby for the county at the state legislature. Hunt received the same salary as Stabler, but no benefits. With the approval of the County Board, Hunt was hired as an administrative assistant by the Hennepin County Library System in October of 1987 and is currently employed in that position.

In late 1988, Hunt served this defamation lawsuit on the University and Stan Kegler. One year later, Hunt moved to amend her complaint to allege tortious interference with prospective business relations and a claim for punitive damages. The University and Kegler moved for summary judgment. The trial court denied the motion to amend as groundless and granted summary judgment for the University and for Kegler.

### ISSUES

I. Did the trial court err in determining there was no jury issue on malice?

II. Did the trial court err in concluding Kegler's statements were constitutionally protected free speech?

III. Did the trial court err in denying Hunt's motion to amend her complaint to allege a claim of tortious interference with prospective business relations and a claim for punitive damages?

### ANALYSIS

■ On appeal from a grant of summary judgment, we determine whether any genuine issues of material fact exist and whether the trial court erred in its application of the law. *Offerdahl v. University of Minn. Hosps. and Clinics*, 426 N.W.2d 425, 427 (Minn.1988). This court views the evidence in the light most favorable to the nonmoving party. *Id.* However, we need not defer to the trial court's decision regarding a legal issue. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639, 642 (Minn.1984). Further, in a case involving the first amendment, an appellate court has a duty to independently

examine the whole record to ensure "the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times Co. v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 729, 11 L.Ed.2d 686 (1964).

Hunt maintains the trial court erred in granting summary judgment for respondents on her defamation claim because Kegler's malicious, slanderous statements were actionable. We disagree. The trial court properly granted summary judgment for respondents even if Kegler's comments were defamatory and false because Kegler's statements were (1) qualifiedly privileged because made in an employment reference context and (2) non-actionable opinions.

### I.

■ Hunt argues the trial court erred by finding Kegler's remarks were qualifiedly privileged. We disagree. The trial court properly found Kegler's statements were a conditionally privileged employment reference and the evidence of malice was insufficient to submit this issue to the jury.

■ A defamatory statement is not actionable if the comment was conditionally privileged and the privilege was not abused. *Lewis v. Equitable Life Assurance Soc'y,* 389 N.W.2d 876, 889 (Minn. 1986). To be privileged, a statement must be made upon a proper occasion, from a proper motive, and based upon reasonable or probable cause. *Id.* Whether a qualified privilege exists in a particular context is a question of law. *Id.* An appellate court may examine the facts supporting the defamatory allegations to determine if they were based on reasonable grounds. *Wirig v. Kinney Shoe Corp.,* 461 N.W.2d 374, 380 (Minn.1990).

■ Qualified privileges are recognized because "statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory." *Lewis,* 389 N.W.2d at 889. Employment references are conditionally privileged because the public interest is best served by encourag-

ing accurate assessments of an employee's performance. *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 257 (Minn.1980). Also, when an employee applies for a promotion, judgmental statements from both the employee's peers and supervisors must be expected and freely permitted. *Gernander v. Winona State Univ.,* 428 N.W.2d 473, 476 (Minn.App.1988).

■ A plaintiff must prove common law malice to overcome a conditional privilege. *Lewis,* 389 N.W.2d at 889. Common law malice is "actual ill will, or intent to causelessly and wantonly injure the plaintiff." *Karnes v. Milo Beauty and Barber Supply Co.,* 441 N.W.2d 565, 568 (Minn.App. 1989), *pet. for rev. denied* (Minn. Aug. 15, 1989). Malice may be shown by extrinsic evidence of personal ill will, or by intrinsic evidence such as the exaggerated language of the statement or the extent of the statement's publication. *Frankson v. Design Space Int'l,* 394 N.W.2d 140, 144 (Minn. 1986).

In the present case, the fact that Kegler was Hunt's peer rather than her supervisor does not prevent his remarks from being conditionally privileged. A peer's evaluation of a co-worker's performance can be just as helpful to a prospective employer as a supervisor's recommendation. The public benefits regardless of the source of the reference as long as the evaluation is honestly made. *Cf. McBride v. Sears, Roebuck & Co.,* 306 Minn. 93, 97, 235 N.W.2d 371, 374 (1975) (communications made by employer's agents during an investigation of employee misconduct are qualifiedly privileged because employer has an interest in protecting itself and the public from dishonest or otherwise harmful employees).

Here, Kegler's statements are conditionally privileged because he commented on Hunt's performance for a proper purpose, an employment reference. A private conversation with a longtime acquaintance was a proper occasion for Kegler to communicate his opinion. Finally, given Kegler's years of work at the legislature, his opinion of Hunt's performance was based upon reasonable grounds. This case is unlike *Wirig* where a new manager called an employee a

thief without personally investigating the allegations. *See Wirig,* 461 N.W.2d at 380. Kegler formed his opinion of his fellow lobbyists' performance, including Hunt's, by speaking with and listening to legislators and their staffs over the course of several years. Kegler indirectly investigated and verified his impression of Hunt each day he was at the legislature. Thus, unlike the manager in *Wirig,* Kegler had personal knowledge to support his statements regarding Hunt.

Other evidence in the record also shows Kegler's statements were supported by probable cause. Hunt herself conceded it would be nearly impossible for someone to have a perfect reputation with everyone at the legislature. *See Kletschka v. Abbott–Northwestern Hosp.,* 417 N.W.2d 752, 755 (Minn.App.1990) (statements based on reasonable grounds because appellant conceded the statements reflected widely held perceptions of her), *pet. for rev. denied* (Minn.Mar. 30, 1988). Several University officials told Sauer they had problems with Hunt's personal style, particularly her lack of warmth. Senator Durenberger agreed not everyone liked Hunt's lobbying technique. Finally, Sauer also had personal style differences with Hunt. The undisputed evidence supporting the defamatory statements provides reasonable grounds for Kegler's remarks.

██ The record does not show any evidence of the malice necessary to overcome Kegler's qualified privilege. As extrinsic evidence of personal ill will, Hunt cites two meetings cancelled in 1985 and two isolated incidents which took place at least a year before Kegler spoke to Andrew. Given Hunt's admission that Kegler harbored no personal animosity toward her, these isolated incidents hardly constitute the evidence necessary to submit the question of malice to a jury. *See Karnes,* 441 N.W.2d at 568 (no actual malice absent evidence of personal animosity). Further, Hunt's speculation that Kegler disliked her because he wanted to control all University lobbying is insufficient to show malice. *See Frankson,* 394 N.W.2d at 144–45 (evidence of possible improper reason for action taken is insufficient to establish malice). In any event, Kegler controlled all University lobbying when he spoke to Andrew and, thus, no longer had this reason to dislike Hunt.

Nor does the record contain any intrinsic evidence of malice. By Hunt's own admission, Kegler's statements do not contain exaggerated language. Hunt agrees Kegler said his statements were confidential and intended only one person to hear his remarks. Under these facts, Hunt's allegations of malice were mere speculation and conjecture, and as such insufficient to submit to a jury.

### II.

██ To be defamatory, a statement must be communicated to someone other than the plaintiff, must be false, and must tend to harm the plaintiff's reputation and to lower her in the estimation of the community. *Stuempges,* 297 N.W.2d at 255. However, the first amendment of the United States Constitution protects some speech from state defamation actions. *New York Times Co.,* 376 U.S. at 283, 84 S.Ct. at 727. Relying on *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), federal circuit courts have held statements of opinion are absolutely protected under the first amendment. *See Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1302 (8th Cir.1986), *cert. denied,* 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986); *Ollman v. Evans,* 750 F.2d 970, 971, 975 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). To distinguish a protected statement of opinion from an actionable statement of fact, the appellate courts considered four factors:

(1) the statement's precision and specificity;

(2) the statement's verifiability;

(3) the social and literary context in which the statement was made; and

(4) the statement's public context.

*Janklow,* 788 F.2d at 1302–03.

The United States Supreme Court recently determined freedom of expression "is adequately secured by existing constitu-

tional doctrine without the creation of an artificial dichotomy between 'opinion' and fact." *Milkovich v. Lorain Journal Co.*, — U.S. ——, ——, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990). After stating the appellate courts' fact/opinion analysis mistakenly relied on dicta in *Gertz*, the Supreme Court said all statements of opinion are not automatically protected by the first amendment. *Id.* at ——, 110 S.Ct. at 2705. Citing existing law, the Supreme Court clarified that only statements regarding matters of public concern which are not sufficiently factual to be capable of being proven true or false, and statements which cannot be reasonably interpreted as stating actual facts, are absolutely protected by the First Amendment. *Id.* at ——, 110 S.Ct. at 2706–07. Thus, contrary to Hunt's argument, *Milkovich* did not abolish constitutional protection for opinions, but instead merely narrowed the privilege.

The test used in *Milkovich* to identify protected opinions is very similar to the four-factor inquiry used by the circuit courts to distinguish fact from opinion. Specificity and verifiability are closely related to whether a statement is capable of being proven false. Whether a remark can be reasonably interpreted as stating actual facts must be inferred from the political, literary, and social context in which the statement was made. Given the similarity between the Supreme Court's definition of protected opinion and the circuit courts' fact/opinion analysis, decisions applying the *Janklow* test are still helpful under *Milkovich*.

Accordingly, the trial court's reliance on *Janklow* to evaluate the statements in the present case does not automatically require us to reverse the grant of summary judgment. The trial court held Kegler's statements were opinions because they were not specific, could not be readily verified and could not be understood as fact in the social and public context in which they were made. Because the trial court essentially based its decision on the very factors adopted in *Milkovich*, it is not necessary to reverse and remand this case for further consideration under *Milkovich*.

Hunt admits Kegler's comments regarding her warmth and sincerity are not actionable under *Milkovich* because those words cannot be proven false. However, Hunt argues Kegler's statement regarding her integrity is actionable because it does not relate to an issue of public concern and reasonably can be interpreted as stating facts about Hunt. We disagree. Readily available information about the qualifications of any public employee is in the public interest. *See Stuempges*, 297 N.W.2d at 257; *McBride*, 306 Minn. at 97, 235 N.W.2d at 374; *see also, Rosenblatt v. Baer*, 383 U.S. 75, 86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966) (public has a general interest in qualifications of governmental employees); *cf., Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971) (qualifications of candidate for public office are a matter of public concern). Here, the Intergovernmental Coordinator was a high level official who would represent the County at the legislature. The Intergovernmental Coordinator would be responsible for persuading the legislature to spend millions of tax dollars in Hennepin County. Speech regarding the qualifications of any candidate for this position would be in the public interest. *See Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 762, 105 S.Ct. 2939, 2947, 86 L.Ed.2d 593 (1985) (speech solely in the individual interest of the speaker is not a matter of public concern). Thus, Hunt's qualifications for the position of Intergovernmental Coordinator were a matter of public concern.

In addition, Kegler's statement regarding Hunt's qualifications is not actionable because it cannot be proven false. In *Milkovich*, the defamatory statements at issue could be objectively verified by comparing two hearing transcripts to determine if Milkovich committed perjury. *See id.* at ——, 110 S.Ct. at 2707. Here, it is impossible to objectively verify Hunt's level of integrity. Even if Kegler's statement is a hybrid statement containing both opinion and underlying facts, the statement still cannot be proven false because "when all the underlying predicate facts are considered, with all their conflicting inferences, the state-

ment is not provable one way or the other." *Diesen v. Hessburg*, 455 N.W.2d 446, 456 (Minn.1990) (Simonett, J., concurring). Since Kegler's statement cannot be proven true or false, it is absolutely protected. *See Milkovich*, _____ U.S. at _____, 110 S.Ct. at 2706.

Further, Kegler's statement cannot be understood as fact in the context in which it was made. By applying for the position with Hennepin County, Hunt knowingly subjected her past employment performance to judgment by her peers and her employers. *Cf. Gernander*, 428 N.W.2d at 476 (statements published in promotion context were protected opinions). Any evaluation of Hunt's work in this context cannot be seen as fact, but instead must be viewed as a personal impression built over the course of time, based on general past experience and limited solely to the individual speaker.

Moreover, Andrew had a private conversation with Kegler, a long-time acquaintance who was also one of Hunt's peers, to learn what Kegler thought of Hunt's performance in a unique arena—the legislature. Having worked at the legislature, Andrew knew it was nearly impossible to have a good relationship with everyone at the capitol. Andrew also was aware that personal opinions regarding a lobbyist's performance were based on general impressions and instinct. Consequently, Andrew knew Kegler's comments about Hunt's work at the capitol did not state actual facts about Hunt, but merely conveyed Kegler's personal evaluation of Hunt's performance.

Hunt argues Kegler should have recontacted individual legislators to ensure his impression was still well-founded or should have examined Hunt's personnel file to further verify his opinion before talking with Andrew. Yet when expressing personal beliefs to long-time friends or acquaintances who have asked for an opinion, few people research the truth and accuracy of their statements before speaking. However, in this case, Kegler's lobbying work with Hunt, his discussions with legislators, and his discussions with other legislative staff gave him a reasonable basis for his opinion.

Although both parties raised the issue, the trial court did not decide whether Hunt was a public official. Appellate review is limited to issues presented to and considered by the trial court in making its decision. *Thayer v. American Fin. Advisers, Inc.*, 322 N.W.2d 599, 604 (Minn.1982). We decline to reach this issue. Given our disposition on previous issues, we also decline to discuss the state law defamation claims.

### III.

A trial court's denial of a motion to amend a complaint will not be reversed on appeal absent a clear abuse of discretion. *Utecht v. Shopko Dep't Store*, 324 N.W.2d 652, 654 (Minn.1982); *Gunnufson v. Onan Corp.*, 450 N.W.2d 179, 181 (Minn.App.1990). After responsive pleadings have been served, a party may amend its own pleading only by leave of the court or by the adverse party's written consent. Minn.R.Civ.P. 15.01. A trial court should freely grant motions to amend when justice requires. *Id.* Nonetheless, an amendment to a complaint may properly be denied when the additional alleged claim cannot be maintained. *See Eisert v. Greenberg Roofing & Sheet Metal Co.*, 314 N.W.2d 226, 228–29 (Minn.1982).

The trial court denied Hunt's motion to amend her complaint to allege a count of tortious interference with a prospective business relationship because Hunt failed to establish Kegler intentionally and improperly interfered with such a relationship, or the interference caused harm to Hunt. Hunt argues the trial court improperly applied the law to the facts of her case. We disagree.

To establish a claim of tortious interference with a prospective business relationship, a plaintiff must prove the defendant intentionally committed a wrongful act which improperly interfered with the prospective relationship. *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 633 (Minn.1982).

 The University and Kegler argue Hunt's tortious interference claim is barred by the statute of limitations. We disagree. An amendment to a pleading alleging a claim arising out of the occurrence set forth in the original pleading relates back to the date of the original pleading. Minn. R.Civ.P. 15.03. In this case, Hunt's new claim of tortious interference arose out of the same facts as her defamation claim. Under these circumstances, the tortious interference claim relates back to the date of the original complaint and is not barred by the statute of limitations.

However, Hunt failed to prove Kegler interfered with her prospective relationship with the county. Andrew testified Kegler's statements did not influence his vote for Intergovernmental Coordinator. Nor did Kegler's comments affect the other commissioners' votes. Even Hunt believes the commissioners first decided to appoint Stabler to the position and then called Kegler for reasons to justify their decision. Thus, Hunt has not shown Kegler interfered with her prospective relationship. *See United Wild Rice,* 313 N.W.2d at 632 (absent showing of interference, no cause of action can lie).

Further, Hunt failed to establish that Kegler intentionally or improperly interfered with Hunt's business relationship with Hennepin County. While the record shows Kegler knew Hunt was a finalist for the position, the record does not establish Kegler intentionally defamed Hunt to prevent her from being hired. Moreover, Kegler's subjectively honest assessment of Hunt's job performance was an employment reference made for a proper purpose. Under these circumstances, the trial court properly refused to amend Hunt's complaint to allege a claim which she could not maintain.

 The trial court also properly denied Hunt's motion to amend her complaint to allege a claim for punitive damages against Kegler. Punitive damages may be awarded when the evidence clearly and convincingly shows the defendant acted with willful indifference to the rights of others. Minn.Stat. § 549.20, subd. 1 (1988). As Hunt has neither an actionable defamation claim nor a tortious interference with prospective business relations claim, she has no grounds upon which to base her claim for punitive damages. Further, Hunt has not shown Kegler acted with willful indifference to her rights. *See Wirig,* 461 N.W.2d at 381 (defendant who subjectively believed in truth of statement did not act with willful indifference). Thus, the trial court properly denied Hunt's motion to amend her complaint.

## DECISION

The trial court properly granted summary judgment for respondents because Kegler's statements were given without malice in an employment reference context. In addition, the statements are not sufficiently factual to be capable of being proven false. Further, the trial court acted within its discretion in denying Hunt's motions to amend her complaint.

Affirmed.