**AEQUITRON MEDICAL, INC.,**
a Minnesota Corporation,
Plaintiff,

v.

**CBS, INC., a New York Corporation,
and CBS News, a Division of
CBS, Inc., Defendants.**

**No. 93 Civ. 950 (DC).**

United States District Court,
S.D. New York.

March 26, 1997.

Best & Flanagan by David B. Morse, Minneapolis, MN, Porzio, Bromberg & Newman, P.C., New York City, for Plaintiff.

Susanna M. Lowy, Cameron A. Stracher, New York City, Faegre & Benson by John P. Borger, Eric E. Jorstad, Minneapolis, MN, for Defendants.

## OPINION

CHIN, District Judge.

On November 2, 1989, defendants CBS, Inc. and CBS News (together, "CBS") broadcast a national news segment on infant heart rate and respiration monitors. The news segment reported that the monitors, which are used to protect infants against sudden infant death syndrome ("SIDS"), were defective and suggested that the flaws were potentially life-threatening. The broadcast focused in particular on monitors manufactured by plaintiff Aequitron Medical, Inc. ("Aequitron").

Aequitron brought this action contending that the November 2, 1989 broadcast contained false and defamatory statements about Aequitron and its SIDS monitors. Two causes of action remain in the case: Aequitron contends that, by virtue of these false statements, CBS (i) engaged in tortious interference with prospective business advantage and (ii) violated the Minnesota Uniform Deceptive Trade Practices Act (the "MDTPA").

To prevail on either claim, Aequitron must prove that the statements made by CBS were indeed false and that they were made by CBS with actual malice or with knowledge of their falsity. On the record before the Court, however, it is clear that certain of the statements in question were "substantially true." Moreover, even assuming that certain of the statements were false or that factual issues exist as to the falsity of certain of the statements, no reasonable jury could conclude that CBS acted with actual malice or that CBS made the statements with knowledge that they were false. Indeed, the statements were made as part of an investigative story about a consumer product that was in fact the subject of lawsuits and government investigations. No reasonable jury could conclude that the statements were made with a "high degree of awareness of probable falsity," *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989), or that CBS "entertain[ed] serious doubts as to the truth of [their] publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325–26, 20 L.Ed.2d 262 (1968).

Accordingly, CBS's motion for summary judgment dismissing the remaining claims in the case is granted. Aequitron's cross-motion for leave to amend its complaint to add a claim for punitive damages is denied.

## BACKGROUND

### A. Facts

Aequitron manufactures, sells and distributes infant heart rate and respiration monitors used to protect infants against SIDS. The monitors were designed to sound an alarm if a baby stopped breathing or the baby's heart stopped beating.

On November 2, 1989, defendants CBS aired on its nationwide television show "CBS This Morning" a segment about SIDS monitors featuring reporter Erin Moriarty ("Moriarty"). The broadcast described the alleged flaws in the monitors and reported that the monitors were the subject of on-going investigations, lawsuits and congressional hearings.

The central flaw alleged to plague the monitors was their purported susceptibility to electromagnetic interference from household appliances such as hairdryers or televisions. The monitors purportedly could mistake these signals for the baby's heartbeat and respiration, as a consequence of which the alarms could fail to sound even though the baby's heartbeat or breathing had stopped.

In particular, the broadcast focused on plaintiff's monitor. Included in the program was an interview with Dr. Joseph Dyro, an expert in biomedical engineering who had performed several tests on plaintiff's monitor prior to being approached by CBS for the telecast.

For the interview, Dr. Dyro conducted a test of plaintiff's monitor in his laboratory. During the test the monitor, while hooked up to a plastic doll, failed to emit any signals warning that there was no heartbeat. The doctor explained on the air that the monitor was detecting very small electrical signals that caused it not to sound an alarm. Moriarty then concluded that "if that occurs on a

real baby that stops breathing, the monitor may not sound, and the baby could die."

Aequitron asserts that CBS deceived the viewing audience by not revealing that the doll was hooked up to an electronic device that simulated the normal impulses given off by the human body and that caused the monitor to malfunction. While the effect of this device on the test is hotly disputed, it is undisputed that the use of this device was not explained to the television viewer.

The broadcast also televised a portion of a videotaped deposition of plaintiff's vice-president, Robert Samec, taken in a lawsuit brought against plaintiff by the parents of a baby who had died while hooked up to plaintiff's monitor. In the excerpt, Samec is asked whether he has confirmed reports of alarm failures on plaintiff's monitors, to which he replies, "Yes, but not in any report of death or injury." In a voiceover, Moriarty then states that the monitor's operating manual does not warn of the possible consequences of the monitor's failure. Samec is then depicted as testifying that he did not "think it was necessary to be that specific" with respect to the consequences.

During the broadcast, Moriarty also stated that Aequitron had refused CBS's request for an interview. Aequitron contends that this statement was false because it had advised CBS that it would be willing to be interviewed, as long as the interview were "live" and not on tape. Aequitron also contends that Moriarty falsely stated on the segment that "most of the experts" were of the view the monitors could give "a false sense of security" when only one expert—Dr. Dyro—had actually made that statement to CBS. Aequitron also contends that Moriarty falsely stated that the monitoring devices were designed "to end the problem" of SIDS, for the devices were not designed for all babies.

The program also included an interview with parents whose babies had allegedly died of SIDS while hooked up to plaintiff's monitor and concluded with a report on the status of the federal investigation into the monitors.[1]

## B. *Procedural History*

Aequitron commenced this lawsuit in the United States District Court for the District of Minnesota on April 11, 1991, alleging four causes of action against CBS: (1) violation of the MDTPA; (2) trade libel; (3) tortious interference with prospective business advantage; and (4) defamation. In January 1993, the court granted defendants' motion to dismiss Aequitron's trade libel and defamation claims for lack of personal jurisdiction, and transferred the MDTPA and tortious interference claims to the Southern District of New York pursuant to 28 U.S.C. § 1404(a).

The case was originally assigned to Judge Sotomayor. While the case was before her, CBS moved to dismiss on statute of limitations grounds. Judge Sotomayor denied the motion, holding that Minnesota law, with its two year statute of limitations, governed the remaining claims, which were filed 18 months after the November 2, 1989 broadcast. *Aequitron Medical, Inc. v. CBS, Inc.*, No. 93 Civ. 950, 1994 WL 30414, at *4 (S.D.N.Y. Feb. 2, 1994). Subsequently, Aequitron moved to amend its complaint to re-assert the trade libel and defamation claims that had been dismissed by the district court in Minnesota. Judge Sotomayor denied leave to amend on futility grounds, holding that the claims were time-barred under Minnesota law because service of process had not been properly made with respect to the trade libel and defamation claims and Aequitron had not attempted to effect proper service on CBS within the statutory time limit. No. 93 Civ. 950, 1994 WL 414361, at *4 (S.D.N.Y. Aug. 5, 1994).

The action was reassigned to me in November 1994. Aequitron then moved to compel certain discovery, and CBS cross-moved for summary judgment. Aequitron's motion was granted and CBS's motion for summary judgment was denied with leave to renew after the completion of discovery. No. 93

---

1. It is not disputed that in 1989, the House Sub-Committee on Health and the Environment conducted hearings about medical devices, including infant heart rate and respiration monitors. One such monitor was Aequitron's monitor. At the same time as the hearings, the FDA was conducting an on-site investigation at Aequitron's plant in Minneapolis, Minnesota.

Civ. 950, 1995 WL 406157, at *4 (S.D.N.Y. July 10, 1995). Discovery has now been completed, and CBS has renewed its motion for summary judgment on the two remaining claims: tortious interference with prospective business relationships and deceptive trade practices. In addition, Aequitron has moved to amend its complaint to assert a claim for punitive damages.

## DISCUSSION

### A. Standard for Summary Judgment

Summary judgment will be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but [to] determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). To defeat a motion for summary judgment, however, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

With these principles in mind, I turn to Aequitron's two claims: tortious interference with prospective business relationship and the MDTPA.

### B. Tortious Interference with Prospective Business Relationship

Aequitron's tortious interference with prospective business relationship claim raises two issues: First, whether, as CBS contends, the "special rules of defamation" apply to a tortious interference claim that is based on allegedly defamatory conduct (Def. Mem. at 40); and, second, if so, whether Aequitron has presented sufficient evidence to raise a genuine issue of fact as to whether CBS acted with actual malice and whether CBS knew that the statements in question were false when they were broadcast on November 2, 1989.

#### 1. Tortious Interference and Defamation

Under Minnesota law, "[t]o establish a claim of tortious interference with a prospective business relationship, a plaintiff must prove the defendant intentionally committed a wrongful act which improperly interfered with the prospective relationship." *Hunt v. University of Minn.*, 465 N.W.2d 88, 95 (Minn.Ct.App.1991) (citing *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 633 (Minn.1982)). CBS contends that, under Minnesota law, where the tortious interference claim is based on conduct that sounds in defamation, the special rules of defamation apply. I agree.

The leading Minnesota case on this issue is the decision of the Supreme Court of Minnesota in *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775 (1975), *cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). There, in the context of a statute of limitations defense, the court held:

> Dr. Wild's claim of wrongful interference with business relationships by means of defamation is essentially a part of his cause of action for defamation and consequently comes within [the Minnesota] 2-year statute of limitations. The defamation which is the means used to interfere with his business relationships action is the same defamation that Dr. Wild seeks to recover damages for under his defamation claim. It seems to us that, regardless of what the suit is labeled, the thing done to cause any damage to Dr. Wild eventually stems from and grew out of the defamation. Business interests may be impaired by false statements about the plaintiff which, because they adversely affect his reputation in the community, induce third persons not to enter into business relationships with him. We feel this phase of the matter has crystallized into the law of defamation and is governed by the special rules which have developed in that field.

234 N.W.2d at 793.[2]

Likewise, the Eighth Circuit has held, with respect to defamation and tortious interference claims brought under Minnesota law in the context of a labor dispute, that the malice standard required for "actionable defamation claims ... must equally be met for a tortious interference claim based on the same conduct or statements." *Beverly Hills Foodland, Inc. v. United Food & Comm'l Workers Union*, 39 F.3d 191, 196 (8th Cir.1994) (footnote omitted). Indeed, the court held that "a plaintiff may not avoid the protection afforded by the Constitution and federal labor law merely by the use of creative pleading." *Id.; accord Johnson v. CBS, Inc.*, No. Civ-3-95-624, slip op. at 5, 1996 WL 907735 (D.Minn. Sept. 4, 1996) (holding that where both defamation and tortious interference claims are pled and are based on same facts, Minnesota law requires the application of the actual malice standard to tortious interference claims).[3]

A decision of the Seventh Circuit (applying Illinois law) also provides support for CBS's position. In *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262 (7th Cir. 1983), a cigarette manufacture sued CBS and news commentator Walter Jacobson for libel and tortious interference with business relations. Judge Posner wrote:

> [a]ny libel of a corporation can be made to resemble in a general way this archetypal wrongful-interference case, for the libel will probably cause some of the corporation's customers to cease doing business with it; and whether this involves an actu-

al breaking of contracts or merely a withdrawal of prospective business would make no difference under the modern law of wrongful interference. But this approach would make every case of defamation of a corporation actionable as wrongful interference, thereby enabling the plaintiff to avoid the specific limitations with which the law of defamation—presumably to some purpose—is hedged about. We doubt that the Illinois courts would allow this end run around their rules on defamation, and we therefore need not consider any constitutional implications of their doing so.

*Id.* at 273–74 (citations omitted).

■ In the present case, Aequitron's tortious interference claim is based on the same allegedly defamatory conduct that formed the basis for its defamation claim. Although the defamation claim has been dismissed, Aequitron nonetheless has been permitted to pursue its claims on the merits—based on the allegedly defamatory conduct—through the tortious interference claim. In these circumstances, it is only fair, and indeed Minnesota law requires, that Aequitron's tortious interference claim be governed by the "special rules" applicable to defamation cases. Wild, 234 N.W.2d at 793. Accordingly, those "special rules" will be applied.

### 2. *Actual Malice*

■ To establish a claim for defamation, a plaintiff must prove that the defendant published: (1) a statement of fact; (2) that was

---

**2.** Aequitron argues that Judge Sotomayor previously held that Wild is not controlling. While Judge Sotomayor did conclude that Wild was not controlling on the issue of whether a tortious interference claim premised as defamatory statements should be treated as a defamation claim for purposes of personal jurisdiction, *Aequitron v. CBS*, No. 93 Civ. 950, 1994 WL 30414, at *7 (S.D.N.Y. Feb. 2, 1994), she reasoned that "[d]etermining an applicable statute of limitations is a procedurally different inquiry than the substantive process for determining whether personal jurisdiction exists over defendants · for conduct which forms the basis of a claim." Id. The issue before me requires analysis that more closely resembles a statute of limitations analysis than an examination of personal jurisdiction. In analyzing the statute of limitations question, the Wild court considered "only the content of the plaintiff's complaint in order to uncover the true

nature of the claim and, accordingly, to apply an appropriate statute of limitations." Id. Similarly, the issue before me now concerns the substance of the underlying allegations, or the "content of the plaintiff's complaint," rather than whether the actors have sufficient ties to the state for personal jurisdiction.

**3.** Because the plaintiff in *Johnson* had *not* pled defamation (unlike Aequitron here), the court reserved decision on whether the defamation standard should be applied to the tortious interference claim. *Johnson v. CBS, Inc.*, No. Civ-3-95-624, slip op. at 5 (D.Minn. Sept. 4, 1996) ("Defendant retains its malice defenses; whether plaintiff must ultimately prove malice where no defamation is alleged is an issue the trial court can decide at some other time.").

false; (3) concerning the plaintiff; (4) tending to harm the plaintiff's reputation and to lower him or her in the esteem of the community. *Foley v. WCCO Television, Inc.*, 449 N.W.2d 497, 500 (Minn.Ct.App.1989). A plaintiff in a defamation action must satisfy all four elements to succeed. *Id.*

■ In addition, a higher standard is imposed upon the plaintiff if the plaintiff is a public official or public figure. In that event, the plaintiff must prove by clear and convincing evidence that the defendant acted with "actual malice." *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Curtis Publ. Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Hunter v. Hartman*, 545 N.W.2d 699, 703 (Minn.Ct.App.1996). Under Minnesota law, the "actual malice" standard also applies when a corporate plaintiff sues a media defendant, if the defamatory material "concerns matters of legitimate public interest in the geographic area in which the defamatory material is published, either because of the nature of the business conducted or because the public has an especially strong interest in the investigation or disclosure of the commercial information at issue." *Jadwin v. Minneapolis Star & Tribune Co.*, 367 N.W.2d 476, 487–88 (Minn.1985) (footnotes omitted), *rev'd on other grounds*, 390 N.W.2d 437 (Minn.Ct. App.1986) (emphasis added). This rule was created to "encourage the media to probe the business world to the depth which is necessary to permit the kind of business reporting vital to an informed public." *Id.*

■ In the present case, it is undisputed that Aequitron is a corporate plaintiff and that CBS is a media defendant. The defamatory material is a matter of legitimate public interest, as it affects the health and well-being of babies and is subject to federal regulation. Thus, the actual malice standard applies.

■ To show actual malice, the plaintiff must prove by clear and convincing evidence that "the defendant made defamatory statements either knowing the statements were false or acting recklessly with regard to whether the statements were true." *Hunter*, 545 N.W.2d at 703 (citing *New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964)). A "reckless disregard for the truth" requires "more than a departure from reasonably prudent conduct"; there must be sufficient evidence to support a conclusion that "the defendant actually had a 'high degree of awareness of ... probable falsity.'" *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989) (citations omitted); *see also Hirman v. Rogers*, 257 N.W.2d 563, 566 (Minn.1977) (actual malice requires "more than mere negligence and probably even more than highly unreasonable conduct" must be shown) (citations omitted). The failure of a publisher to conduct an investigation before publishing, even if a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. *Harte–Hanks Communications*, 491 U.S. at 688, 109 S.Ct. at 2696; *St. Amant v. Thompson*, 390 U.S. 727, 731, 733, 88 S.Ct. 1323, 1325–26, 1326–27, 20 L.Ed.2d 262 (1968) (plaintiff must demonstrate that the author "in fact entertained serious doubts as to the truth of his publication"). Truth, of course, is a complete defense. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980).[4]

■ In evaluating summary judgment motions in defamation cases, the Supreme Court has held that courts must take into account the "clear and convincing" standard of proof mandated by *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Thus, in defamation cases, "[t]here is no genuine issue of material fact if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513.

■ With these principles in mind, I will now review the five allegedly defamatory

---

4. Similarly, a claim of tortious interference cannot be maintained against a defendant who merely provides truthful information to someone else. *Glass Service Co. v. State Farm Mutual Automobile Ins. Co.*, 530 N.W.2d 867, 871 (Minn. Ct.App.1995).

statements or omissions relied on by Aequitron: (a) CBS's failure to disclose Dr. Dyro's use of an electrical device to emit electrical signals; (b) the alleged misuse of Robert Samec's deposition testimony; (c) the allegedly false statement that Aequitron had refused CBS's request for an interview; (d) the allegedly false statement that experts had criticized the monitors; and (e) the allegedly false statement that the monitors were designed to end the problem of SIDS.[5]

### (a) The Use of an Electrical Device

Aequitron alleges that CBS's failure to disclose Dr. Dyro's use of an electrical device and "K–Y Jelly" constituted a false statement of fact, because it was those devices that purportedly prevented the Aequitron monitors from sounding an alarm, not electromagnetic interference. Specifically, Aequitron alleges that "CBS and Moriarty were at all times ... aware that the monitor reflected respiration and heart beat signals from the rubber doll solely as a result of the attachment of the certain electronic devices to the rubber doll." (Compl. ¶ 18). Moreover, Aequitron contends that CBS's failure to inform the audience that without the use of the electronic device the lead alarm would have sounded constituted a false representation of fact. (Pl. Mem. in Opp. at 39). The difficulty with Aequitron's position, however, is that Dr. Dyro used the electronic device to simulate the electrical load of a *non-breathing* baby.

According to Robert Samec, Aequitron's Vice President, the apnea monitor works by passing a small electric current through a baby's chest via two electrodes attached to the baby's skin. (Borger Aff. Ex. Y at 31). An electric signal is sent from one electrode through the human body and is then picked up by the other electrode, completing the circuit. (*Id.* at 72). K–Y Jelly is a substance occasionally used to connect the electrodes to the baby's skin.

The monitor has three circuits. One circuit measures the change in "impedance" as the baby breathes, which can be an indication of respiration. (*Id.* at 32). Impedance, a measure of the total opposition to the current flow in an alternating-current circuit, is a measure of conductivity of organic matter. (Borger Aff. Ex. Y at 39–40) ("You measure base impedance in terms of ohms. Ohms is a measure of electrical resistance ... [which is] [r]esistance to current flow between two conductors, two conductive surfaces."). When the baby inhales, the impedance increases because air is non-conductive. (*Id.* at 44). When the baby exhales, impedance decreases because blood and tissue are more conductive than air. The monitor then keeps track of this slight change in impedance that indicates that the baby is breathing.

A second circuit measures the electrical activity related to the contraction of the heart ventricle. A third circuit acts as what is referred to as a "lead alarm," which essentially monitors whether the electrodes are properly attached to the baby by measuring the "total system impedance"—the impedance throughout the entire device as it is connected to the patient. (*Id.* at 40). This circuit emits an alarm if an electrode is not properly connected or is making poor contact with the baby's skin. (*Id.* at 41). This circuit also emits an alarm if the electrodes are attached to something that is a poor conductor of electricity. Essentially, the device is "calibrated to expect a certain impedance in [a] body and if it does detect that impedance, the device will not sound the lead alarm." (*Id.* at 73). Conversely, if it does *not* detect that impedance, the device will sound the lead alarm. In other words, the "lead alarm" will signal if the monitor is hooked up to something whose conductivity does not resemble that of an infant's body.

Because a plastic doll is made of different material than a baby, it has a different resistance level. In fact, a plastic doll is a very

---

5. As CBS correctly points out, the latter three statements were not pled in the complaint, as required by Minnesota law. *American Book Co. v. Kingdom Pub. Co.*, 71 Minn. 363, 73 N.W. 1089, 1090 (1898) ("[I]t is well settled that the specific words which have been published must be set out. It is not sufficient to merely state the effect of the language, or that the publication was of a certain defamatory tenor and import."; *Pinto v. Internationale Set, Inc.*, 650 F.Supp. 306, 309 (D.Minn.1986) ("A claim for defamation must be pled with specificity."). Nonetheless, I will address them.

poor conductor of electricity, while a baby is an adequate conductor. (Borger Aff. Ex. U at 93) ("resistance [in a plastic doll] is high enough to trigger the lead-off alarm").[6] Therefore, to test the other two alarms—the respiration and heart beat alarms, which are independent of the lead alarm—the experiment must simulate the minimal amount of electrical impulses that even a non-breathing baby emits so that the lead alarm will not sound merely because the machine is hooked up to something other than a baby. (*Id.*). Thus, contrary to Aequitron's assertions, the use of the electrical device was designed to permit valid testing of the first and second circuits by neutralizing the third circuit, rather than to create false results.

■ Even assuming, without deciding, that the statements regarding the monitor were false—i.e., that Dr. Dyro did in fact use the electronic device and K–Y Jelly and those implements distorted the results of the demonstration—Aequitron has failed to present evidence from which a reasonable jury could conclude that CBS knew or should have known that the use of those implements would distort the test results. Thus, on the record before the Court, no jury could find that CBS acted with actual malice in failing to disclose the use of these implements.

CBS has presented substantial evidence to support its assertion that it had no knowledge that the results would be false. First, Dr. Dyro testified that he told CBS that he believed that his demonstration was a valid test:

> Q: Do you believe that the test that you performed on the 8200 Aequitron Monitor for CBS was a valid test to determine if there were any problems with the functioning of that monitor?
>
> A: I believe that the test was a valid test to the limit of my biomedical engineering ability.
>
> . . .

6. Aequitron does not dispute this conclusion, as Robert Samec, Aequitron's vice president, admits:

> Q: If you just connect [the monitor] to a doll without any electronic circuitry, will you get an alarm?

Q: Did you ever tell Erin Moriarty that it was an invalid test?

A: No.

Q: Anybody else from CBS?

A: No.

. . .

Q: Did you indicate to CBS that the test you performed was a valid test?

. . .

A: I cannot recall my saying it in exactly those words, yes, this is a valid test. I can indicate to you that the validity of the test was to my recollection inquired of by Erin Moriarty, about, what is it that you are doing. And I described what I was doing, and indicated to her that I made the valid assumption on the basis of my biomedical engineering knowledge that would lead me to believe that the test that I was demonstrating, or the test that I was performing was a valid test.

(Borger Aff. Ex. T at 233–35).

Second, Moriarty testified that she did not know that the use of the electronic monitor and K–Y Jelly might produce false results:

> [w]hat I asked Dr. Dyro was could he test with a doll. I asked could he perform a valid test with a doll. He said he could perform a valid test, something that I could rely on, using the doll, if he made an adjustment to the doll. That's what our discussion was. . . . I went to him because I believed that if anyone knew exactly what was standard in this business and how to perform a proper test, Dr. Dyro would be that person.

(Borger Aff. Ex. W at 289–90). Specifically, Dr. Dyro told CBS that the signals being picked up by the monitor and causing it to fail to sound the alarm were "not being produced by the model that [he] ha[d] created" but were "extraneous signals which normally exist in our electrical environment." (Borger Aff. Ex. M). He explained that while "the monitor needs to be sensitive to detect the

. . .

A: You will get a lead alarm.

(Borger Aff. Ex. Y at 85).

normal low level of electrical activity that's produced by the normal beating heart ... [t]he problem occurs when the sensitivity of monitors like this is so high that when the heart activity stops that sensitivity will still pick up extraneous signals." (*Id.*).

Aequitron, on the other hand, insists that CBS knew that the use of the electrical device and K–Y Jelly would distort the test results. Aequitron has failed, however, to present any concrete evidence from which a rational finder of fact could make that finding. Although Aequitron alleges that Dr. Dyro "affirmatively told CBS that he needed to use an electronic device to simulate respiration and heart beat" (Pl. Mem. in Opp. at 11), the portions of Dr. Dyro's deposition testimony it cites do not show actual malice. For example, Aequitron relies on the following excerpt:

Q: Did you ever discuss the need to use the electronic device with anybody from CBS?

A: Yes.

Q: When was that?

A: During the course of the interview and the filming on November 1.

(Morse Aff. Ex. E at 81). The portion of the transcript immediately following this exchange, however, reveals that no reasonable factfinder could find that this testimony supports Aequitron's assertions:

Q: What did you say ... [a]bout the electronic device[?]

A: About the electronic device—I explained its purpose.

Q: What did you say about its purpose?

A: I said that the monitor has a lead-off alarm.... And that if the device were connected to a PVC, or polyvinyl chloride, doll without a simulated load, that the lead-off alarm would sound. And since my demonstration is intended to show the performance of the monitor on a baby that is not breathing, has no heart rate, it is reasonable and valid to substitute for this baby, for this real-live baby, it is reasonable and valid to substitute a simulated

load. The simulated load is the electronic device that I referred to earlier.

(*Id.* at 81–82).

When asked about the simulated load, Dr. Dyro explained:

A simulated load is an electronic, passive electronic device, without batteries, without any energy source, which consists of devices called capacitors and resistors. This simulated load characterizes and is similar to the resistance and capacitance of the human body.

(*Id.* at 83). Dr. Dyro needed to use this simulated load to re create the electrical output of a non-breathing baby. Thus, far from telling CBS that he was using an electronic device to simulate *respiration* and *heart beat* in the hopes of producing false results, this testimony shows clearly that Dr. Dyro told CBS he was using a device to simulate the electronic output of a non-breathing baby to permit the proper testing of the respiration and heart beat monitors.

In further support of its assertion that CBS knew of the false results produced by Dr. Dyro, Aequitron points to portions of Dr. Dyro's testimony in *Davis v. Aequitron Medical, Inc.*, No. 88–1870–G, before the District Court in Texas.[7]

Q: I've seen the clip on that demonstration and I did not see any mention by you of any device that was simulating heart beat or respiration. Did you tell the people on the CBS show what you were doing?

A: Yes.

(Morse Aff. Ex. F at 16). Once again, the testimony following this exchange paints a different picture:

Q: You told them you had a device that was basically simulating or faking or whatever you want to call it, the heartbeat and the respiration?

A: No, that's not the case at all—

Q: What exactly did you tell them?

Mr. Wavell: I'm going to interrupt right here. Mr. Van Huseman, when Mr. Dyro is attempting to answer and respond to your question, I don't want you to inter-

---

7. This case involved a suit brought by Michael and Cory Davis against Aequitron after their child, who had been connected to an Aequitron monitor, stopped breathing and died.

rupt him. I want you to let him respond fully.

(*Id.*). Contrary to Aequitron's assertions, this testimony does not constitute evidence from which a rational juror could find that Dr. Dyro told CBS he was producing false test results as a result of the use of an electronic device. As is made clear by the testimony that followed, Dr. Dyro's comment that he was telling CBS "what [he] was doing" refers to his set up procedures, including the use of the simulated load, not that he was using a device to create false test results.

Aequitron also cites Dr. Dyro's testimony that he told Moriarty when she arrived about his use of an electronic device, explaining to her that the device was necessary to simulate the load:

Q: Did you show this electronic device to Erin Moriarty?

A: My recollection is that the monitor was set up. My recollection is that I did, or at least that I indicated where it was. My recollection is that I showed it to her.

Q: You talked with her about it?

A: Yes.

Q: You told here that it was necessary to simulate the load?

A: Yes.

(Morse Aff. Ex. E at 83–85). The testimony shows that Dr. Dyro was simply informing CBS that he needed to use the electronic device to "simulate the load" in order to replicate a non-breathing baby. That is hardly tantamount to telling CBS he knew the device would lead to false test results.

Finally, Aequitron cites testimony that Dr. Dyro told CBS that his electrical load device produced "signals."

Q: And when you were dealing with the interviewer on CBS's show, it's your testimony now that you told them that you had some type of a load placed on the doll, electrical load which produced these signals?

A: Yes.

Q: Okay, and if they—

A: Let me clarify that. It was a load consisting of electronic passive components.

(Morse Ex. F at 19). Once again, Dr. Dyro was referring to simulating the load to suppress the lead alarm to permit the proper testing of the respiration and heart beat alarms. As is clear from the testimony, Aequitron consistently conflates the use of the electrical device to create a simulated load with the use of a device to simulate breathing and heartbeat. Consequently, even assuming the test results were false, Aequitron has failed to present sufficient evidence to permit a reasonable jury to find by clear and convincing evidence that CBS knew that use of the electronic device would produce false test results.

Nor has Aequitron produced any evidence to show that CBS acted with actual malice or a reckless disregard for the truth or that CBS should have had any awareness that the test might produce faulty results. Again, Aequitron has produced no evidence to show that Dr. Dyro knew that his experiment would produce allegedly false results. As Aequitron admits, Dr. Dyro had never tested the monitor on a doll prior to the night before his interview with CBS. (Pl. Mem. in Opp. at 11; Morse Aff. Ex. E at 79–81). At most, this failure shows that Dr. Dyro was unsure of what results would be produced by his experiment, not that he knew those results would be false.

Moreover, plaintiff's own expert, Dr. John G. Webster, testified that "there was nothing remarkable" about Dr. Dyro's use of a passive device "to get to the point where you could conduct some sort of test or demonstration on the respiration and heart rate alarms." (Borger Aff. Ex. CC at 44). This testimony undercuts Aequitron's argument that CBS should have had enough knowledge to question the experimental techniques of an expert like Dr. Dyro.

Dr. Webster also testified that there was nothing about Dr. Dyro's experiment that would have obviously led to a faulty result. (*Id.* at 34). Furthermore, although Dr. Webster testified that after performing his own experiments, he came to the conclusion that Dr. Dyro's experiment produced signals the monitor perceived as heart beat and respiration signals, he admitted that prior to his own experimentation he did not anticipate

these results. (*Id.* at 44–45). None of this evidence supports an argument that CBS should have suspected that Dr. Dyro's experiment could lead to faulty result, and thus, CBS did not act with "reckless disregard" in airing the broadcast.

### (b) *Robert Samec's testimony*

The broadcast contained two excerpts from the deposition of Robert Samec taken in the *Davis* case. Aequitron alleges that the excerpts were presented, as a result of selective editing by CBS, in a defamatory manner.

As to the first excerpt cited by Aequitron, Moriarty states:

> Cage Wavell, the Davis's lawyer, says Aequitron officials have collected reports of monitor failure since 1983. While they refused our request for an interview, Vice President Robert Samec admitted such failures in his deposition taken two months ago.

The broadcast then presents the following questions and answers, asked by the Davis's lawyer, Wavell, and answered by Samec:

> Q: Just a minute—Are you telling us then that there are alarm failures and you actually confirmed them?
>
> A: Yes, but not in any report of death or injury.
>
> Q: Well, but you have confirmed alarmed failures, haven't you?
>
> A: I most certainly have, yes.

(Borger Aff. Ex. WW at 336). Aequitron alleges that a comparison of this exchange to the actual questioning of Samec by Wavell shows that they are discussing "alarm failures" while Moriarty's voiceover is actually referring to "monitor failure."

The second excerpt cited by Aequitron begins with Moriarty stating, "But nowhere in the operator's manual are parents warned of the possible consequences" while the cover of the Aequitron manual appears on the screen. (Pl. Mem. in Opp. at 60). The camera then shows Samec stating, "No, I don't think it is necessary to be that specific no"—which, according to Aequitron, implies that Samec is saying there is no need to warn of the possible "consequences" of alarm failure. Aequitron argues that Samec is actually respond-ing to a question about warnings provided by Aequitron regarding the placement of monitors near electrical devices.

▮▮▮▮▮ As to the first excerpt, the use of the word "alarm" rather than "monitor" does not so alter the meaning of Samec's statements as to render them no longer "substantially true." *Hunter v. Hartman*, 545 N.W.2d 699, 706 (Minn.Ct.App.1996) (in affirming trial court's application of "substantial truth" test, court held on appeal that "a more recent doctrine extends First Amendment protection to statements that are 'substantially true'—that is, 'supportable interpretations' of ambiguous underlying situations") (citations omitted); *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517–18, 111 S.Ct. 2419, 2433, 115 L.Ed.2d 447 (1991) (common law of libel "overlooks minor inaccuracies and concentrates upon substantial truth"). In any event, no reasonable jury could conclude that the substitution of the word "monitor" for the word "alarm" in this context was done with actual malice.

▮▮▮▮ As to the second excerpt, an examination of Samec's deposition testimony reveals that the exchange in question cannot support Aequitron's interpretation:

> Q: But to the users and to the people who prescribe these monitors to users, did you ever provide the warning or the possibility of the false respiration being caused by objects being moved in or near the monitor, by the monitor?
>
> A: We have provided warning that essentially the device shouldn't be placed near certain electrical devices, et cetera. Did we provide a warning? Yeah, in that context, yes.
>
> Q: Is that the only context in which you provided such a warning?
>
> A: From an object doing it, yes.
>
> Q: Did you, in that warning, explain to the user or anyone else what the *consequences* of using the device near an appliance might be?
>
> A: I believe our warning says something to the effect of *improper device operation might occur*. I can't recite it specifically.

Q: Do you think it would have been helpful to advise that user that a false negative could occur, that is, *your baby could quit breathing but the monitor would not alarm* if you do such a thing as place the monitor near such a thing as a small electrical appliance?

A: No, I don't think it was necessary to be that specific, no.

(Borger Aff. Ex. WW at 236–37) (emphasis added). The transcript clearly shows that Samec is in fact responding to a question regarding the specificity of the "consequences" of using the monitor near an appliance, namely that the alarm could fail to sound even though the child had stopped breathing. Thus, the editing of the deposition testimony did not create a "false" statement. Moreover, even assuming the statement was false, no reasonable jury could conclude that it was made with actual malice.

### (c) *Aequitron's Purported Refusal to be Interviewed*

■ Aequitron alleges that Moriarty's statement that Aequitron "refused our request for an interview" was false and defamatory. (Pl. Mem. in Opp. at 43). To support this claim, Aequitron points to the testimony of Curtis J. Olsen, President of Aequitron, in 1989:

Q. How did you first learn of the Erin Moriarty report?

A. I don't remember, but I did learn of it because I woke up earlier to see it.

Q. So you knew sometime in advance that it was going to be broadcast?

A. I knew a day in advance. We were contacted by CBS in New York to be on with their camera and their people. They were actually going to fly people from New York out rather than use a local affiliate. My answer back to them was that I would not let them cut and tape my remarks, that I would go on only if I could go on live and properly explain our position. Now, that could be how I found out it was going to be that day.

(Morse Aff. Ex. T at 25–26). While it would have been more *precise* for CBS to have stated that, although Aequitron declined to be interviewed on tape, it did offer to be interviewed live, it is "substantially true" that Aequitron "refused [CBS's] request for an interview," as CBS's request was for an interview not "live," but on tape. Aequitron declined to give such an interview. Moreover, the statement was not made with actual malice, and in these circumstances, no reasonable jury could conclude otherwise.

### (d) *The Experts*

■ Aequitron contends that CBS falsely suggests its position was supported by a number of experts. Toward the end of the broadcast, Moriarty was asked, "If as the company claims the risk is one-half of one percent with the device, wouldn't the device be better than nothing at all?" (Pl. Mem. in Opp. at 46). Moriarty responded, "Well, you know, that's very interesting. We asked that question of several experts because we were concerned ... [b]ut no, in fact, most of the experts, although they said this is not the worst monitor on the market, that there are actually even ones that are worse, they say it can give someone a false sense of security...." (Pl. Mem. in Opp. at 47).

Aequitron argues that there was in fact only one expert—Dr. Dyro—who said that the monitor could give a person a false sense of security. In response to interrogatories, CBS listed three people who could be considered "experts," including Dr. Dyro. CBS does not dispute that of the experts listed in the response, only Dr. Dyro stated that the monitor could offer a false sense of security. It certainly would have been more accurate for CBS to state that one out of three experts had made such a statement, and its reference to "most" of the experts was an exaggeration. Even assuming the statement was false, however, in context—"most of the experts ... say [the monitor] can give someone a false sense of security"—the statement was not made with actual malice and no reasonable jury could conclude otherwise.[8]

---

**8.** Aequitron also presents two other allegations with regard to these experts. First, Aequitron contends that it was false for CBS to state that

"most of the experts" said that the Aequitron 8200 was not the worst monitor on the market, when only one doctor, Dr. Yount, made such a

#### (e) *Ending the Problem of SIDS*

■ Aequitron alleges that CBS was misleading in stating that "[t]hese monitoring devices were designed to end the problem of Sudden Infant Death Syndrome, or crib death, which currently takes 8,000 young lives a year." (Pl. Mem. in Opp. at 52). Aequitron argues that because a substantial number of the babies who die of SIDS every year are healthy and thus not eligible to use the prescription-only monitors, this statement is false. In other words, the prescription-only monitor could not really be designed to end all cases of SIDS because it is only aimed at ending the likelihood of SIDS for those babies eligible to receive the monitor by prescription.

■ While Aequitron is correct in pointing out that the monitor was technically designed to end SIDS only for those babies who are actually eligible to receive the monitor, it is "substantially true" to state that the monitor was designed "to end the problem of SIDS." In addition, no reasonable jury could conclude that the statement was made with actual malice.

### C. *MDTPA*

The MDTPA provides in relevant part:

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

. . .

(5) represents that goods or services have. . . characteristics . . . that they do not have

. . .;

(7) represents that goods or services are of a particular standard, quality, or grade . . . if they are of another;

(8) disparages the goods, services, or business of another by false or misleading representation of fact;

. . .

(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Minn.Stat. § 325D.44. The statute applies to broadcasters, however, "only if [they] have either knowledge of the deceptive trade practice or a financial interest in the goods or services being deceptively offered for sale." Minn. Star. § 325D.46 subd. 1a; *see also United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 634 (Minn.1982) (plaintiff has burden of proving the statements are false). As Aequitron does not allege that CBS has a financial interest in the goods or services, the only question is whether CBS had "knowledge of the deceptive trade practice."

■ As is evident from the discussion above, Aequitron has failed to demonstrate the existence of a genuine issue of material fact as to whether CBS knew of any "deceptive trade practice." Even assuming that Dr. Dyro's use of the electronic device and the K–Y Jelly did constitute a "deceptive trade practice," plaintiff has failed to come forth with any evidence that CBS knew that the use of such implements would produce distorted results. Accordingly, summary judgment is proper.

### CONCLUSION

For the foregoing reasons, CBS's motion for summary judgment is granted and Aequitron's motion for leave to amend to add a claim for punitive damages is denied as moot. The Clerk of the Court shall enter judgment dismissing the complaint with prejudice and with costs.

SO ORDERED.

---

statement. (Pl. Mem. at 51). This statement is simply not defamatory.

Second, Aequitron alleges that CBS's statement that it asked "several experts" whether the device was better than nothing at all was also false. However, Aequitron has failed to produce any evidence, much less enough evidence to raise an issue of genuine fact, about whether CBS asked this question of the three doctors listed as sources of information, including Dr. Dorothy Kelly and Dr. John Yount, both described as having done studies about the safety of baby monitors. (Morse Aff. Ex. K at 3).